*This opinion is subject to revision before final publication in the Pacific Reporter*

**2014 UT 51**

IN THE

# SUPREME COURT OF THE STATE OF UTAH

In the Matter of the Adoption of J.S., a minor child.

WILLIAM E. BOLDEN,
*Appellant and Intervenor,*

*v.*

JOHN and JANE DOE,
*Appellees and Petitioners.*

No. 20120751
Filed November 4, 2014

Fourth District, Provo Dep't
The Honorable Lynn W. Davis
No. 114402317

Attorneys:

Mark W. Wiser, Scott B. Wiser, Salt Lake City, for appellant

Larry S. Jenkins, Lance D. Rich, Salt Lake City, for appellees

JUSTICE LEE announced the judgment of the court and authored the opinion of the court as to Parts I, II.A.1, II.A.2.a–b, and II.B, and a plurality opinion with respect to Parts II.A.2.c and II.A.3.

CHIEF JUSTICE DURRANT joined JUSTICE LEE's opinion in full.

JUDGE ORME concurred in the judgment and joined JUSTICE LEE's opinion with respect to Parts I, II.A.1, II.A.2.a–b, and II.B.

ASSOCIATE CHIEF JUSTICE NEHRING filed a dissenting opinion.

JUSTICE PARRISH filed a dissenting opinion.

Having recused herself, JUSTICE DURHAM did not participate herein; DISTRICT JUDGE GREGORY K. ORME sat.

JUSTICE LEE, opinion of the Court in part:

¶1 William Bolden is the putative father of a child (J.S.) born in 2011. The case before us on appeal is an adoption proceeding in-

volving John and Jane Doe, the would-be adoptive parents of J.S. Bolden tried to intervene in and object to the Does' adoption of J.S. He was barred from doing so because he failed to preserve his legal rights as a father by filing a paternity affidavit within the time prescribed by Utah Code section 78B-6-121(3).

¶2   This provision of the Utah Adoption Act prescribes the requirements that an unwed father must meet in order to secure the right to assert his parental rights and object to an adoption. It is aimed at protecting the best interests of children born out of wedlock—to ensure that such children have the benefit of a parent committed to preserving their well-being. Unwed mothers acquire parental rights—and the accompanying right to object to an adoption—as a result of the objective manifestation of the commitment to the child that is demonstrated by their decision to carry a child to term. An unwed father's legal obligation to file the paternity affidavit is a rough counterpart to the mother's commitment. When a child is born out of wedlock, the mother, the father, or both may assert their parental rights and thereby foreclose an adoption. But if the mother and father choose to waive that right—or, in the case of a father, fails to assert the right by filing the paternity affidavit in a timely fashion—then the child may be placed for adoption.

¶3   Utah law is roughly in line with the adoption laws of all states across the country. In every state unwed fathers are required to fulfill legal requirements not imposed on unwed mothers—most commonly, a filing aimed at establishing the father's paternity. *See infra* ¶ 79 n.35. In Utah and elsewhere, the failure to fulfill such requirements in the timeframe required by law amounts to a waiver of the unwed father's right to object to an adoption. This consequence is essential to the goal of protecting children by facilitating adoption. Without a requirement of a timely paternity filing, adoptions would be inhibited by being left in limbo.

¶4   The affidavit requirement in Utah law takes the matter of a paternity filing a minor step further—by requiring the father not just to assert and establish paternity, but also to attest under oath that he is able and willing to provide for the child. UTAH CODE § 78B-6-121(3). But this is a simple, straightforward hurdle—one that countless unwed fathers have cleared, in a manner preserving their parental rights and their prerogative of foreclosing adoption.

¶5    Bolden failed to fulfill this requirement, and in this case he challenges it as unconstitutional. We reject his constitutional challenges and therefore affirm the district court's denial of his motion to intervene in the Does' adoption of J.S.

¶6    First, we uphold the affidavit requirement against Bolden's due process challenge. Bolden does not claim that the Adoption Act infringes his procedural due process right to notice and an opportunity to be heard; nor could he, as his failure to file the affidavit is a result of his own procedural misstep (allegedly in accordance with the misadvice of counsel) and not some procedural defect in the law. And Bolden fails to establish an infringement of a fundamental right of substantive due process, as he fails to present evidence that the right he asserts (to preserve his rights as an unwed father without filing an affidavit) is a matter deeply rooted in established history and tradition.

¶7    Second, we also uphold the affidavit requirement against Bolden's equal protection challenge. We do so by recognizing the importance of the state's interests in protecting children by facilitating the adoption process, and by concluding that those interests are substantially advanced by the statutory affidavit requirement. We likewise reject Justice Nehring's assertion that this requirement is an indication of invidious discrimination or sex-based stereotyping. *See infra* ¶¶ 93-98, 111.

¶8    There is doubtless room for disagreement about whether our legislature has struck the best balance as a matter of policy. But we see no basis for deriding our law as a product of "invidious gender stereotypes." *Infra* ¶ 88. At some level all adoption laws discriminate against unwed fathers—by requiring of them some legal filing not required of unwed mothers. Such requirements are not an indication of stereotype or discrimination. They are simply an element of a legal scheme aimed at assuring that any parent who would block an adoption has manifested a commitment to the child's best interests. And we uphold the Utah Adoption Act as constitutional on the basis of its advancement of those important interests.

I

¶9    In the summer of 2010, Bolden was involved in a sexual relationship with S.B. The two were not married. S.B. eventually got pregnant. Approximately two weeks before the baby was born,

Bolden filed a petition in the district court seeking to adjudicate paternity and to establish custody, parent time, and child support.

¶10 Bolden's unsigned, unverified petition asserted that he was "a fit and proper parent." It sought "sole physical and legal care, custody, and control of [his] unborn child should [S.B.] decide not to raise the child and attempt to put the child up for adoption." In the petition Bolden also asserted that "a child support order should enter, effective immediately," consistent with statutory guidelines, including an obligation to obtain health insurance for the child.

¶11 One week later, Bolden filed in Utah's putative father registry a sworn and notarized notice that he had commenced paternity proceedings regarding S.B.'s unborn child. But he did not file a separate affidavit asserting his willingness to assume custody of the child and to submit to a child support order, or disclosing his childcare plans, as required by Utah Code section 78B-6-121(3)(b). Bolden attributes his deficiency in this regard to his attorney's failure to advise him that such an affidavit was required. Though Bolden offered—both before and after the birth of the child—to pay S.B.'s pregnancy-related medical expenses, S.B. refused to accept anything from Bolden, believing that her insurance would cover all costs.

¶12 The child, a boy, was born on March 26, 2011. Bolden initially visited the child in the hospital twice, but was thereafter refused access and thus prevented from having any further contact. Three days after the birth, S.B. determined that she wanted to proceed with an adoption and executed a consent to adoption before Judge Lyon of the Second District Court.[1] S.B. relinquished the child to the prospective adoptive parents (the Does), who commenced an adoption proceeding that same day. Though their adoption petition acknowledged that they knew the identity of the child's father and that the father had made some effort to establish parental rights, they asserted that the father's failure to file

---

[1] The paternity and adoption actions originally proceeded separately—the former in Second District Court before Judge Lyon, the latter in Fourth District Court before Judge Davis. They were consolidated before Judge Davis upon joint stipulation and motion of the parties.

an affidavit along with his paternity petition was determinative of his rights—in short, that he had none.

¶13 The Does thereafter notified Bolden of their intent to adopt J.S. without Bolden's consent. Bolden moved to intervene in the adoption proceeding, seeking to prevent the adoption and to assert his parental rights. Between receiving the Does' Notice of Adoption Proceedings and filing his motion to intervene, Bolden also filed the affidavit required by section 78B-6-121(3).

¶14 The adoptive parents opposed Bolden's motion to intervene, arguing that Bolden could not prevent the adoption because he had not complied with the statute by filing an affidavit before S.B. relinquished the child. Bolden acquired new counsel and challenged the constitutionality of section 78B-6-121(3)'s affidavit requirement, moving for summary dismissal of the adoption petition on federal and state constitutional grounds. Bolden also sought dismissal on the ground that he was the undisputed father of J.S., that he did not consent to the adoption, and that he had strictly and timely complied with *most* of the applicable statutory requirements.

¶15 The district court heard oral argument on the motions and issued a memorandum decision rejecting Bolden's constitutional challenges. It concluded that Bolden had no right to contest the adoption because he had not filed the affidavit required under Utah Code section 78B-6-121(3). In rejecting Bolden's constitutional claims, the district court found that the affidavit requirement related directly to the state's interests in requiring unwed fathers to demonstrate a full commitment to their parental responsibilities, in minimizing the risk of disrupting adoptions, and in protecting the rights of unwed mothers.

¶16 Upon issuance of a final order dismissing Bolden's intervention and summary judgment motions, Bolden filed this appeal. Bolden's appeal challenges the district court's judgment on legal grounds. Our review is accordingly de novo. *See Manzanares v. Byington (In re Adoption of Baby B.)*, 2012 UT 35, ¶ 41, 308 P.3d 382.

II

¶17 Under our Adoption Act, the consent of an unmarried biological father is not generally required for the adoption of a child who is six months of age or less at the time of placement. *See* UTAH CODE § 78B-6-121(3). Yet the statute prescribes an important

exception to the general rule. An unmarried biological father's consent is required if, before the time the mother executes consent for adoption or relinquishes the child for adoption, the father:

> (a) initiates proceedings in a district court of Utah to establish paternity under Title 78B, Chapter 15, Utah Uniform Parentage Act;
> (b) files with the court that is presiding over the paternity proceeding a sworn affidavit:
>> (i) stating that he is fully able and willing to have full custody of the child;
>> (ii) setting forth his plans for care of the child; and
>> (iii) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth;
> (c) consistent with Subsection (4), files notice of the commencement of paternity proceedings, described in Subsection (3)(a), with the state registrar of vital statistics within the Department of Health, in a confidential registry established by the department for that purpose; and
> (d) offered to pay and paid, during the pregnancy and after the child's birth, a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth, in accordance with his financial ability . . . .

*Id.* § 78B-6-121(3).

¶18 Bolden acknowledges his failure to comply with the affidavit requirement of subsection (b) above. Yet he seeks to excuse such failure by challenging the constitutionality of the statutory requirement, asserting that it violates his rights to due process, uniform operation of laws, and equal protection. We find no merit in any of Bolden's constitutional claims[2] and accordingly affirm.

---

[2] Bolden does not cleanly distinguish between federal and state constitutional claims. He frames his arguments in terms of state constitutional protections, yet frequently relies on caselaw interpreting federal rights. *E.g.*, *Lehr v. Robertson*, 463 U.S. 248 (1983) (analyzing federal due process and equal protection);

A. Due Process

¶19  In addressing Bolden's due process arguments, we first clarify the distinction between procedural and substantive due process and identify the nature of the claim before us here. After classifying Bolden's due process challenge as substantive, we then establish the governing legal framework and standard of scrutiny, and finally proceed to reject Bolden's arguments under the applicable standards.

1. Substance v. Procedure

¶20  The Due Process Clause has been construed to encompass both a procedural and a substantive component. Under the procedural component, the courts have long recognized a general right to notice and an opportunity to be heard. *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010); *Long v. Ethics & Discipline Comm. of the Utah Supreme Court*, 2011 UT 32, ¶ 29, 256 P.3d 206. Thus, for rights the law deems subject to formal process (in courts or other adjudicative bodies), due process requires notice reasonably calculated to inform parties that their rights are in jeopardy[3] and a meaningful opportunity to be heard in the course of such proceedings.[4] *See Wells v. Children's Aid Soc. of Utah*, 681 P.2d 199, 204 (Utah 1984) (explaining that procedural due process requirements encompass the "notice and opportunity to be heard"

---

*Thurnwald v. A.E.*, 2007 UT 38, 163 P.3d 623 (analyzing both federal and state due process in constitutional avoidance); *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199 (Utah 1984) (analyzing both federal and state due process rights). And he makes little or no effort to identify anything in the text or history of the Utah Constitution dictating an analysis that is distinct from that called for under federal precedent. We accordingly analyze Bolden's due process argument under federal standards and his uniform operation of law arguments under our precedent applying equal protection doctrines.

  [3] *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950); *Jackson Constr. Co. v. Marrs*, 2004 UT 89, ¶ 10, 100 P.3d 1211.

  [4] *See Turner v. Rogers*, 131 S. Ct. 2507, 2517 (2011); *Chen v. Stewart*, 2004 UT 82, ¶ 68, 100 P.3d 1177.

that "must be observed in order to have a valid *proceeding* affecting life, liberty, or property") (emphasis added).

¶21 The due process right to an opportunity to be heard may be lost due to a procedural misstep, however. A statute of limitations, for example, may foreclose a cause of action before it is ever litigated on its merits.[5] A procedural bar prescribed by statute has a similar effect.[6]

¶22 Such limitations may be challenged on either *procedural* or *substantive* due process grounds. A procedural due process attack on a statute of limitations or procedural bar would take the form of an assertion that such a limitation forecloses any meaningful opportunity for the plaintiff to protect its rights.[7] A substantive challenge would take a different form. It would involve a broad-

---

[5] *See Davis v. Provo City Corp.*, 2008 UT 59, ¶ 27, 193 P.3d 86 (right to bring an action may be foreclosed by statutes of limitations, which "cut off the right to bring an action after a particular period of time").

[6] *See* UTAH CODE § 63G-7-401(2) (containing the Utah Government Immunity Act provision that any claimant with a right of action must, as a prerequisite to filing suit, file written notice of the claim with the government entity before maintaining the action).

[7] *See Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 437 (1982) (explaining due process requires "an *opportunity* . . . granted at a *meaningful time* and in a *meaningful manner* . . . for [a] hearing appropriate to the nature of the case" (alteration in original) (internal quotation marks omitted)); *Terry v. Anderson*, 95 U.S. 628, 632–33 (1877) (upholding a nine-month and seventeen-day statute of limitations on the ground that "[t]his court has often decided that statutes of limitation affecting existing rights are not unconstitutional, if a reasonable time is given for the commencement of an action before the bar takes effect"); *Burford v. State*, 845 S.W.2d 204, 207, 208 (Tenn. 1992) (holding that a three-year limitation on presenting post-conviction claims "provides a reasonable opportunity" for doing so, but striking the requirement as applied to a defendant whose post-conviction claim did not accrue until after the limitation had passed, as he was "deprive[d] . . . of such a reasonable opportunity").

side attack on the fairness of the procedural bar or limitation, on the ground that the right foreclosed is so fundamental or important that it is protected from extinguishment.[8]

¶23 Bolden's claim is of the latter variety. He nowhere claims that the Adoption Act forecloses his meaningful access to the justice system.[9] Nor could he. The affidavit requirement is simple

---

[8] *See Montagino v. Canale*, 792 F.2d 554, 557–58 (5th Cir. 1986) (discussing framework for substantive due process challenge to statute of limitations); *Crier v. Whitecloud*, 496 So. 2d 305, 308–09 (La. 1986) (upholding a medical malpractice statute of limitations against a due process challenge on rational basis review); *Valentine v. Thomas*, 433 So. 2d 289, 293 (La. Ct. App. 1983) (establishing framework for substantive due process challenges under state constitution to statute of limitations); *State v. Egdorf*, 77 P.3d 517, 521–22 (Mont. 2003) ("Substantive due process bars arbitrary governmental actions regardless of the procedures used to implement them . . . .").

[9] Applicable standards of procedural due process do not yield free-wheeling authority for the courts to second-guess the wisdom or fairness of legislative policy judgments. As the dissent indicates, the courts have long held that "an unwed father who 'demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child,' acquires 'substantial protection' under the due process clause." *Infra* ¶ 123 (Nehring, J., dissenting) (quoting *Lehr v. Robertson*, 463 U.S. 248, 261 (1983)). But that interest is a substantive interest in an inchoate fundamental right. And that inchoate right is perfected only *when* the father follows reasonable state laws regulating the manner in which he is to demonstrate his "full commitment to the responsibilities of parenthood." *Infra* ¶ 123 (Nehring, J., dissenting) (internal quotation marks omitted). A failure to do so, moreover, means that the inchoate right is lost.

Nothing in the cases Justice Nehring cites yields a judicial prerogative to second-guess the wisdom of state law standards for a father's perfection of his inchoate rights under the guise of procedural due process. The courts are in no position to second-guess the proper length of a particular statute of limitations under a procedural due process balancing test. And we are likewise in no position to second-guess the wisdom of the legislature's policy

and straightforward. And Bolden failed to fulfill it not because it was difficult but because his counsel allegedly gave him bad legal advice. *See infra* ¶ 63.

¶24 Thus, Bolden's argument is framed as a substantive challenge to the fairness of the affidavit requirement.[10] Throughout his opening and reply briefs, Bolden repeatedly characterizes his claim as one challenging the statutory affidavit requirement as "substantively unconstitutional" and as aimed at establishing a "fundamental," "substantive right" of an unwed father as a parent.

¶25 Justice Nehring's dissent portrays Bolden's case differently. It insists that Bolden's arguments encompass both procedural and substantive due process, while conceding that Bolden briefed only the latter. *Infra* ¶¶ 114, 116. And it contends that Bolden asserts that the affidavit requirement may deprive him of the procedural right "to be heard 'at a meaningful time and in a meaningful manner.'" *Infra* ¶ 117 (Nehring, J., dissenting) (quoting *Mathews v. Eldridge*, 424 U.S. 319, 333 (1976)). But the argument put forward

_____

decisions regarding statutory prerequisites to establish an unwed father's parental rights.

The *In re Baby Girl T.* case cited by the dissent, *infra* ¶ 124, is not to the contrary. There we did not extend the *Mathews* balancing test to a matter that the legislature placed outside the bounds of adjudicative process. Instead, in a matter directed precisely within those bounds (of an unwed father seeking to assert his statutory right to participate in judicial proceedings), we engaged in standard analysis of the procedural due process question of the core right of notice and an opportunity to be heard. *See R.C.S. v. A.O.L. (In re Baby Girl T.)*, 2012 UT 78, ¶¶ 16–32, 298 P.3d 1251. Thus, *Baby Girl T.* is not a case establishing the propriety of procedural due process analysis of a substantive limit on access to an adjudicative proceeding. It is a core application of procedural due process analysis within such a proceeding, and as such it has no application here.

[10] *See Black v. Sec. of Health & Human Servs.*, 93 F.3d 781, 789 (Fed. Cir. 1996) (rejecting a procedural due process challenge and declining to apply procedural analysis where "what the petitioners [really] object to is not the denial of a hearing, but the substantive rule of eligibility that has been applied to them").

by the dissent appears nowhere in Bolden's briefs. Bolden no-
where complains of the sufficiency of the notice he was given un-
der Utah law or of the adequacy of the opportunity he was pro-
vided to "'submit evidence'" or to otherwise prepare or present
his case in court. *See infra* ¶ 121 (quoting *Christiansen v. Harris*, 163
P.2d 314, 317 (Utah 1945)). Thus, neither *Mathews v. Eldridge* nor
*Christiansen v. Harris* is anywhere cited by Bolden on appeal. Nor
are any of the other cases cited by Justice Nehring in support of
his concerns regarding the "procedural protections" inherent in
the right to procedural due process. *Infra* ¶ 121.[11]

¶26 Bolden's only allusion to procedural due process in his
briefs is in a defensive response to arguments put forward by the
adoptive parents. In his opening brief, Bolden reiterated his claim
to a substantive right to a fair "*opportunity* to develop a relation-
ship with his newborn and thereby convert his provisional rights
into vested parental rights," while asserting that "this opportunity
interest could easily be rendered illusory if the state was free to

---

[11] Tellingly, even Justice Nehring's analysis is ultimately fo-
cused on matters of substance, not procedure. Instead of question-
ing the extent of the notice to Bolden or of the opportunity to
present his case, the dissent ultimately asserts—in a section of the
opinion captioned "Procedural Due Process"—that the statutory
affidavit requirement is "so onerous and arbitrary that [it] vi-
olate[s] . . . due process." *Infra* ¶ 126. The basis for that conclusion,
moreover, bears no relation to the standards of procedural due
process outlined in the cases cited earlier in the dissenting opi-
nion. *Compare infra* ¶¶ 119–20 (citing *Mathews v. Eldridge* for a ba-
lancing test dictating the appropriate level of adjudicative proce-
dure based on a weighing of the "private interest" affected and
the costs and value of additional procedures), *with Montagino*, 792
F.2d at 557–58 (noting that on substantive due process challenge
to statute of limitations the standard was one of "whether the sta-
tute is arbitrary"). Instead of weighing the costs and benefits of
additional adjudicative procedures, the dissent simply asserts that
the statutory affidavit requirement is "so onerous and arbitrary"
that it crosses a "line" envisioned by the dissent as establishing
the bounds of "fundamental fairness." *Infra* ¶ 126. That conclusion
is indistinguishable from that set forth in the substantive due
process section of the dissenting opinion—a point that reinforces
the inherently substantive nature of the issue on appeal.

impose '*any process*' it wanted on a father's ability to perfect his provisional interest." The adoptive parents seized on this formulation in their responsive brief on appeal. To the extent Bolden claimed a violation of an *opportunity* to be heard, the adoptive parents quoted our cases for the proposition that "the test for whether a provision of the Adoption Act's putative father provisions passes due process muster is whether '[t]he Act [] give[s] him a meaningful and adequate procedure to protect this interest.'" *R.C.S. v. A.O.L. (In re Adoption of Baby Girl T.)*, 2012 UT 78, ¶ 20, 289 P.3d 1251. And under that standard, the adoptive parents asserted that Bolden's claim failed as a matter of law because the affidavit requirement was "meaningful and adequate" and because Bolden admittedly failed to comply with it.

¶27 Bolden responded in his reply brief by repudiating any reliance on procedural due process. While acknowledging the adoptive parents' argument "that an unwed father's due process rights are merely procedural" and are satisfied by "whatever 'process' the legislature offers him," Bolden emphasized the *substantive* nature of his due process claim. Specifically, Bolden confirmed that his due process challenge was to the "*substantive* constitutionality of the affidavit requirement at issue," while emphasizing that that claim subsisted regardless of whether the statutory limitations in question were "applied in a *procedurally* fair manner."

¶28 Thus, in its content and its terminology, Bolden's claim sounds only in substantive due process.[12] We accordingly proceed to establish the standard of scrutiny that applies to this claim.

---

[12] In any event, a procedural due process claim would fall flat in this case even under the cases cited by Justice Nehring's dissent. "[T]he State *certainly* accords *due* process when it terminates a claim for failure to comply with a reasonable procedural or evidentiary rule." *Logan*, 455 U.S. at 437 (first emphasis added); *see also Hammond Packing Co. v. Arkansas*, 212 U.S. 322, 350–51 (1909) (default judgment as discovery sanction for failure to produce evidence not a violation of due process). Bolden failed to do just that. He failed to present evidence (an affidavit) essential to his claim, and he is accordingly in no position to complain that his own failure amounted to a violation of procedural due process.

The dissent's other cases are unavailing. This is not a case of a claimant who is foreclosed from protecting his interests by an inability to comply with a procedural requirement in the first place.

2. Standard of Scrutiny

¶29 The right to due process is principally about *process*—procedure, not substance. Most of this court's caselaw in the field is thus about the nature and extent of the *notice* required by the constitution, and of the *opportunity to be heard* once such notice is afforded. *See Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 204 (Utah 1984) (noting that "[m]ost due process cases concern *procedural* requirements, notably notice and opportunity to be heard"). The same is true at the federal level. For the most part, the due process precedent in the United States Supreme Court likewise is aimed at clarifying the kind of notice and opportunity to be heard that is guaranteed by the constitution.[13]

---

*See Logan*, 455 U.S. at 424–26, 435–36 (holding that a state labor commission failed to convene a procedurally required hearing, thus depriving litigant of future hearing); *People v. Germany*, 674 P.2d 345, 351–52 (Colo. 1983) (involving a three-year time bar on all post-conviction collateral attack, the effect of which was to "immediately cut off this right for all persons whose convictions antedate the statute by an interval of time in excess of the statutory limitation period"); *Burford*, 845 S.W.2d at 208 (three-year limitation on presenting post-conviction claims "provides a reasonable opportunity" for doing so, but striking the requirement as applied to a defendant whose post-conviction claim did not accrue until after the limitation had passed, as he was "deprive[d] . . . of such a reasonable opportunity"); *see also Lehr*, 463 U.S. at 264 ("[I]f qualification for notice [of an adoption] were *beyond the control of an interested putative father*, it might be thought procedurally inadequate." (emphasis added)); *In re Baby Girl T.*, 2012 UT 78, ¶ 31, (holding filing requirement violated due process as-applied to putative father where he deposited notice of paternity with state agency, but through agency's negligence notice was not filed until after the mother had consented to an adoption).

[13] *See, e.g.*, *Swarthout v. Cooke*, 131 S. Ct. 859 (2011) (holding that prisoners up for parole received adequate process when given opportunity to be heard and provided reasons for denial of parole); *Wilkinson v. Austin*, 545 U.S. 209, 225–26 (2005) (holding that informal, nonadversary procedures were adequate to safeguard liberty interest inmates had in not being assigned to supermax fa-

¶30 On a few occasions, the courts have recognized new substantive rights under the umbrella of due process. *See, e.g., Roe v. Wade*, 410 U.S. 113 (1973); *Griswold v. Connecticut*, 381 U.S. 479 (1965). But the Due Process Clause is not a license for the judicial fabrication of rights that judges might prefer, on reflection, to have been enshrined in the constitution. Our role in interpreting the constitution is one of interpretation, not common-law-making. Thus, the judicial recognition of new fundamental rights of substantive due process is the exception, not the rule. *See Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 225 (1985) ("Although the Court regularly proceeds on the assumption that the Due Process Clause has more than a procedural dimension, we must always bear in mind that the substantive content of the Clause is suggested neither by its language nor by preconstitutional history . . . ." (internal quotation marks omitted)).

¶31 That said, the principle of substantive due process is ingrained in both federal and state precedent. So although we proceed cautiously in this domain, we cannot repudiate the substantive due process inquiry altogether. We should instead prescribe carefully the grounds and the basis for the recognition of any alleged right of substantive due process. To do so, we start with some general background in federal precedent, proceed to more specific precedent as applied to parental rights of unwed fathers, and conclude by articulating the standard of scrutiny applicable here.

a. The lesson of *Lochner*

¶32 Substantive due process reached its apex in the so-called *Lochner* era. During this period, in decisions like *Lochner v. New York*, 198 U.S. 45 (1905), the United States Supreme Court routinely struck down legislation infringing on economic rights (such as the freedom of contract) that it deemed inherent in the guarantee

---

cility); *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) (holding that due process protections require a hearing prior to discharge of employee who has constitutionally protected property interest in employment); *Bell v. Burson*, 402 U.S. 535, 542 (1971) (holding that except in emergency situations, due process requires notice and opportunity for hearing appropriate to the nature of the case before revocation of a driver's license).

of the Due Process Clause. In *Lochner* itself, for example, the court held unconstitutional a labor law restricting the number of hours that bakers were allowed to work in a day in New York (ten), concluding that the law was an "unreasonable, unnecessary, and arbitrary interference with the right of the individual" to contract. *Id.* at 56; *see also Adkins v. Children's Hosp.*, 261 U.S. 525 (1923) (striking down federal minimum wage legislation as violative of substantive due process).

¶33 Such expansive use of the Due Process Clause was hardly uncontroversial. *Lochner*-type invocations of substantive due process sparked now-famous dissents from the likes of Justices Holmes and Harlan, who decried the "ever increasing scope" of the substantive due process rights recognized by their colleagues, and noted the tendency of the doctrine to "give us carte blanche to embody our economic and moral beliefs in its prohibitions." *Baldwin v. Missouri*, 281 U.S. 586, 595 (1930) (Holmes, J., dissenting); *see also Lochner*, 198 U.S. at 75 (Holmes, J., dissenting) ("Some of these laws embody convictions or prejudices which judges are likely to share. Some may not. But a Constitution is not intended to embody a particular economic theory . . . ."); *id.* at 68 (Harlan, J., dissenting) ("If the end which the legislature seeks to accomplish be one to which its power extends, and if the means employed to that end, although not the wisest or best, are yet not plainly and palpably unauthorized by law, then the court cannot interfere.").

¶34 The dissenting view eventually carried the day. In cases marking the beginning of the so-called Progressive Era, the court began to disavow *Lochner*-style decisionmaking. *See West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937) (overruling *Adkins*, and upholding minimum wage legislation). And by the mid-1950s, the court categorically—and unanimously—concluded that "[t]he day is gone when this Court uses the Due Process Clause of the Fourteenth Amendment to strike down state laws, regulatory of business and industrial conditions, because they may be unwise, improvident, or out of harmony with a particular school of thought." *Williamson v. Lee Optical of Okla.*, 348 U.S. 483, 488 (1955). Thus, with regard to substantive due process challenges to economic regulations, "[t]he almost universal" standard embraced by the courts today is "a rational basis test so tolerant that the substan-

tive content of economic statutes rarely violates due process." *Wells*, 681 P.2d at 205.[14]

---

[14] Justice Nehring's dissent spurns the above discussion of the *Lochner* era as a "lengthy exposition" that has "no place" in our analysis. *Infra* ¶ 133. That critique is puzzling. *Lochner* is the key bugaboo of substantive due process jurisprudence in the twentieth century. The courts' experiment with *Lochner*-style decisionmaking has had an enormous impact on our current approach to this field of law. That is evident in the fact that *Lochner* is still often raised — as it is here — in both state and federal precedent as a cautionary reminder of the perils of over-exuberant invocations of the judicial power to recognize new fundamental rights. *See Wells*, 681 P.2d at 205 (citing scholarly literature and cases addressed to the "almost universal opinion that substantive due process was abused in invalidating economic regulations in the first third of this century" under *Lochner* and its progeny, while suggesting that the judicial reaction to this era "has culminated in a rational basis test so tolerant that the substantive content of economic statutes rarely violates due process"); *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 347 (2007) (describing *Lochner* as "a time when [the] Court presumed to make . . . binding judgments for society under the guise of interpreting the Due Process Clause," and cautioning that it is "[ground] we should not seek to reclaim"); *McDonald v. City of Chicago*, 561 U.S. 742, 130 S.Ct. 3020, 3062 (2010) (Stevens, J., dissenting) (stating that the "now-repudiated *Lochner* line of cases attests to the dangers of judicial overconfidence in using substantive due process to advance a broad theory of the right or the good"); *Powell v. State ex rel. Or. Dep't of Land Conservation & Dev.*, 243 P.3d 798, 802 (Or. Ct. App. 2010) (beginning a substantive due process analysis by putting caselaw in "historical perspective" and repudiating the "much-maligned '*Lochner* era' of Supreme Court jurisprudence"). We raise it with that in mind and place our understanding of the law of substantive due process in the historical context of the court's experiment with *Lochner*-style decisionmaking. This is no mere "academic pursuit." *Infra* ¶ 133. It is an attempt to explain our current law in light of its historical background and to add a continuing voice of caution regarding the enticing, yet difficult-to-restrain concept of substantive due process.

¶35  That approach has not been broadly extended beyond the realm of economic rights. With respect to noneconomic rights, the court has continued to uphold certain substantive rights under the Due Process Clause. As noted above, for example, the court has struck down, as violative of due process, restrictions on access to contraception, *see Griswold*, 381 U.S. 479, and to abortion, *see Roe*, 410 U.S. 113.

¶36  But the anti-*Lochner* backlash of the Progressive Era has also had an impact in the realm of noneconomic rights. *See Wells*, 681 P.2d at 205 (noting, in expressing reluctance to extend new rights of substantive due process, "[t]he almost universal opinion that substantive due process was abused in invalidating economic regulations in the first third of [the twentieth] century"). In recent decades, both this court and our federal counterparts have expressed a diminishing appetite for the judicial recognition of new substantive due process rights in the social realm.

¶37  In *Washington v. Glucksberg*, 521 U.S. 702 (1997), for example, the United States Supreme Court declined to recognize a substantive due process right to assisted suicide. In so doing, the court noted the uneasy status of the concept of substantive due process, expressing concern for the slipperiness of the judicial slope. *Id.* at 723 n.23 (noting the potential for judicial abuse, while asserting that once recognized, there is "no principled basis" for confining the right).

b. Substantive due process and parental rights

¶38  We expressed a parallel concern in *In re J.P.*, 648 P.2d 1364 (Utah 1982). In *J.P.* we built on federal precedent in recognizing a fundamental right for a mother not to lose her rights to her child absent proof of unfitness, abandonment, or neglect. *Id.* at 1367. In so doing however, we first acknowledged our discomfort with the judicial recognition of new "rights unknown at common law" and "not mentioned in the Constitution," particularly as to "substantive due process innovations undisciplined by any but abstract formulae." *Id.* at 1375 (citing *Moore v. City of East Cleveland*, 431 U.S. 494, 503, n.12 (1977)[15]).

---

[15] The *Moore* opinion, in turn, emphasized the crucial importance of a limitation "grounded in history" and tradition, noting that such limitation is much "more meaningful than any based on

¶39 In recognizing the fundamental interest of a mother in retaining her parental rights absent proof of unfitness, abandonment, or neglect, our *J.P.* opinion first established a narrow, limiting principle. As a predicate to establishing such a right, we first found that such right was "'deeply rooted in this Nation's history and tradition,' and in the 'history and culture of Western civilization.'" *Id.* (citations omitted). In support of that conclusion, we cited extensive historical evidence of the "deeply rooted" nature of this right. *See id.* at 1374 ("The integrity of the family and the parents' inherent right and authority to rear their own children have been recognized as fundamental axioms of Anglo-American culture, presupposed by all our social, political, and legal institutions."). Because the statute at issue in *J.P.* infringed on the fundamental right recognized by this court, we found it unconstitutional. We held, specifically, that "a mother is entitled to a showing of unfitness, abandonment, or substantial neglect before her parental rights are terminated," and that the statute that made "no provision for that showing" was "unconstitutional on its face." *Id.* at 1377.

¶40 In reaching this conclusion, our decision in *J.P.* built upon the United States Supreme Court's decision in *Stanley v. Illinois*, 405 U.S. 645 (1972). In *J.P.*, we cited *Stanley* as establishing the unconstitutionality of an Illinois statute "presuming unwed fathers to be unfit [as] a violation of the due process clause." 648 P.2d at 1374 (citing *Stanley*, 405 U.S. at 651). In the context of an unwed father who had lived with his children at least "intermittently for 18 years," we noted that *Stanley* had upheld the fundamental right of "'a man in the children he has sired and raised,'" a right that was deemed to "'warrant[] deference and, absent a powerful countervailing interest, protection.'" *Id.* (quoting *Stanley*, 405 U.S. at 651).

¶41 Our *J.P.* opinion was discussed and extended in our subsequent decision in *Wells*. In *Wells*, we considered the constitutionality of a statute predicating an unwed father's establishment of his parental rights on the statutory condition of the filing of an acknowledgement of paternity prior to the child's placement for adoption. 681 P.2d at 202–03 (considering the constitutionality of

the [mere] abstract formula" of judicial intuition or preference. *Moore*, 431 U.S. at 503 n.12.

UTAH CODE § 78-30-4 (1953)). Building on United States Supreme Court precedents culminating in *Lehr v. Robertson*, 463 U.S. 248 (1983), our opinion in *Wells* concluded that the standard of scrutiny under the federal Due Process Clause was a deferential standard of arbitrariness. Citing *In re J.P.* and *Lehr*, we acknowledged the provisional right of an unwed father to parent his children while also recognizing the state's interest in "immediate and secure adoptions for eligible newborns" providing "justification for significant variations in the parental rights of unwed fathers." 681 P.2d at 203. And we noted that *Lehr* had upheld a New York provision requiring notice of an adoption proceeding to an unwed father "only if he had filed a notice of intent to claim paternity with the putative father registry" on the ground that "'a more open-ended notice requirement would . . . complicate the adoption process, threaten the privacy interests of unwed mothers, create the risk of unnecessary controversy, and impair the desired finality of adoption decrees.'" *Id*. (quoting *Lehr*, 463 U.S. at 249). Because *Lehr* upheld the New York provision on the ground that it was not "arbitrary," we applied an arbitrariness standard in *Wells* in upholding the then-applicable requirement of Utah law of filing an acknowledgement of paternity as a prerequisite to an unwed father preserving his provisional rights as a parent. *Id*. (holding that the acknowledgement of paternity requirement was "not 'arbitrary'" and was "therefore constitutional under the Due Process Clause of the United States Constitution").

¶42 Our *Wells* decision adopted a different standard under the Utah Constitution, however. Although we upheld the acknowledgment of paternity requirement under the state constitution as well, we did so only after first adopting a standard of heightened scrutiny. *Id*. at 206. That standard, we concluded, followed from the *J.P.* opinion's recognition of "parental rights as 'fundamental,'" and from a prior decision in which we had invoked heightened scrutiny in addressing a void-for-vagueness challenge to a statute impinging on "fundamental rights" (such as the right to travel). *Id*. (citing *In re Boyer*, 636 P.2d 1085, 1087–88 (Utah 1981)). Thus, under the Utah Constitution's Due Process Clause, we concluded in *Wells* that "the proponent of legislation infringing parental rights must show (1) a compelling state interest in the result to be achieved and (2) that the means adopted are 'narrowly tai-

lored to achieve the basic statutory purpose.'" *Id.* (quoting *Boyer*, 636 P.2d at 1090).[16]

¶43 The standard invoked in *Wells*, however, is in some tension with the standards employed in subsequent cases. Despite *Wells*, for example, our more recent cases have held that an unwed father's "inchoate" right in his child may be lost if he fails to follow *reasonable* state procedures for perfecting that right. And our recent cases have done so in a manner foreclosing the sort of heightened scrutiny prescribed in *Wells*.

¶44 In *T.M. v. B.B. (In re Adoption of T.B.)*, 2010 UT 42, 232 P.3d 1026, for example, we emphasized that the guarantee of due process recognizes only "an inchoate interest" of an unwed biological father. *Id.* ¶ 31 n.19. And we concluded that that interest rises to the level of a fundamental right "only when [the father] 'demonstrates full commitment to the responsibilities of parenthood by [coming] forward to participate in the rearing of his child.'" *Id.* (second alteration in original). Because the father in *T.B.* had failed to satisfy the statutory prerequisites to perfecting his inchoate parental rights, we held that the "natural mother's relinquishment of [his] child" for adoption "eliminate[d] his opportunity to acquire constitutionally protectable parental rights." *Id.* ¶ 40. And we accordingly rejected the biological father's argument that there was "no compelling need for the premature termination of [his] . . . parental rights based solely on procedural noncompliance," concluding that the fact that he "could have complied with the statutory scheme established by the Utah Legislature for acquiring the right to withhold consent to an adoption" foreclosed his alleged fundamental right. *Id.* ¶¶ 28, 41.

---

[16] *See also Thurnwald v. A.E.*, 2007 UT 38, ¶¶ 28, 33, 44, 47, 163 P.3d 623 (reiterating this standard in identifying a potential constitutional problem with applying the Adoption Act's requirement of a paternity petition within twenty-four hours of the birth of a child in a manner that would "make it impossible for unwed fathers of children born on weekends or holidays to preserve their rights postbirth," but interpreting the statutory filing deadline to be subject to extension under Utah Rule of Civil Procedure 6 and interpreting the statute to provide a "minimum period of twenty-four hours after the child's birth to file a paternity claim" in a manner avoiding the constitutional question).

¶45 We reiterated a similar standard in *In re Adoption of Baby Girl T.*, 2012 UT 78. In that case, we explained that "[u]nder both federal and state law, an unwed biological father has an inchoate interest in a parental relationship with his child that acquires full constitutional protection only when he demonstrates a full commitment to the responsibilities of parenthood by [coming] forward to participate in the rearing of his child." *Id.* ¶ 18 (alteration in original) (internal quotation marks omitted). And we accordingly held that an "unmarried biological father" must only "be given an adequate opportunity to comply with the[] statutory requirements of the Adoption Act in order to assert" a fundamental interest in his parental rights. *Id.* ¶ 19 (alteration in original) (internal quotation marks omitted). In addition, we again emphasized that an unwed father's right is simply "in the *opportunity* to develop a substantial relationship" with his child, and thus concluded that if the governing statute provides a "meaningful chance" for the father to protect his interests, "he may not complain of the termination of his interest when he fails to strictly comply with its procedures." *Id.* ¶ 20.

### c. The standard of scrutiny applicable here

¶46 The foregoing sets the stage for our statement of the applicable standard of scrutiny. It also emphasizes the difficulty of so doing, given the evident tension in our caselaw. Our cases have consistently applied a deferential standard of *federal* due process scrutiny of statutory prerequisites to the establishment of parental rights of unwed fathers. *See Wells*, 681 P.2d at 206 (provision of adoption statute was not "arbitrary" and thus did not violate federal due process protections); *In re Adoption of T.B.*, 2010 UT 42, ¶ 31 (adoption statute preserved "meaningful chance" for putative father to preserve opportunity to develop relationship with his child and thus satisfied due process). Our statement of the applicable *state* constitutional standard has been inconsistent, however. *Wells* calls for heightened scrutiny on the ground that a father's parental rights are "fundamental." 681 P.2d at 205 ("fundamental rights of parenthood" require a "higher level of scrutiny" under Utah's Due Process Clause). But our subsequent cases apply a much more deferential standard—one in line with the federal standard of scrutiny. *See In re Baby Girl T.*, 2012 UT 78, ¶¶ 11, 19 (due process requires that putative father "have a meaningful chance" to preserve opportunity of relationship with child).

¶47 The standard in *T.B.* and *Baby Girl T.* runs directly counter to that set forth in *Wells*. Instead of applying a heightened standard of scrutiny, our *T.B.* opinion expressly rejected the biological father's argument that showing a "compelling" interest was necessary. *See In re Adoption of T.B.*, 2010 UT 42, ¶ 29. And it applied instead a standard turning only on a showing of a "reasonable opportunity [of a biological father] to preserve his chance to develop a relationship with his child." *Id.* ¶ 42. *Baby Girl T.* is to the same effect. *See In re Baby Girl T.,* 2012 UT 78, ¶¶ 11, 19.

¶48 This tension in our caselaw is nowhere reflected on the face of our opinions. Perhaps the parties in our more recent cases were unaware of the heightened standard applied in *Wells*; at a minimum they appear not to have called it to our attention. But the tension as to the state standard of scrutiny is front and center in this case. It is reflected clearly in the briefing. Bolden expressly invokes the *Wells* standard of heightened scrutiny. And the adoptive parents cite *T.B.* and *Baby Girl T.* in support of the deferential "reasonable opportunity" or "meaningful chance" standard.

¶49 We are therefore faced with the question of how to resolve this tension—a question not directly confronted in any of our prior cases. And we resolve it in favor of the deferential standard of scrutiny set forth in our more recent cases. We do so, first, because *T.B.* and *Baby Girl T.* are our most recent pronouncements on this issue. Because these cases appear to have overtaken *Wells* on this point, they should control. Litigants in Utah are entitled to rely on our explication of the law as definitive.[17] And although *T.B.* and *Baby Girl T.* do not expressly overrule *Wells* on the state standard of scrutiny, the two lines of cases are unquestionably incompatible. That, without more, would suggest to a litigant that our most recent pronouncement is the law, and has overtaken any prior contrary statement. *See Malan v. Lewis*, 693 P.2d 661, 676 (Utah 1984) (noting "[t]he general rule from time immemorial" that an opinion from this court "is deemed to state the true nature of the law both retrospectively and prospectively").

¶50 Second, and in any event, the *Wells* standard of scrutiny was unnecessary to the outcome in that case, and may thus be

---

[17] *See Carter v. Lehi City*, 2012 UT 2, ¶ 15, 269 P.3d 141 (emphasizing that "[l]itigants ought to be able to rely" on our opinions).

viewed as over-enthusiastic dicta.[18] Because the *Wells* decision upheld the then-applicable acknowledgement of paternity filing against a state constitutional due process challenge, the court could easily have reached the same conclusion under a more deferential standard. That renders the heightened standard of scrutiny in *Wells* unnecessary to the result. We accordingly read *T.B.* and *Baby Girl T.* as controlling. .[19]

---

[18] We use the term *dicta* in the sense of "[a] court's stating of a legal principle more broadly than is necessary to decide the case," BLACK'S LAW DICTIONARY 519 (so defining *gratis dictum*), or "[a]n opinion by a court on a question that is directly involved, briefed, and argued by counsel and even passed on by the court, but that is not essential to the decision," *id.* (so defining *judicial dictum*). So the disagreement with the dissent on this point is not a matter of one of us speaking truth and the other falsity, *see infra* ¶ 140 (Nehring, J., dissenting) (disagreeing with the court's understanding of *obiter dictum*); it is simply a matter of nuanced variations in terminology. Thus, we acknowledge that the standard set forth in the *Wells* opinion was not a matter of "'illustration, argument, analogy, or suggestion'" that was not part of the court's holding. *Infra* ¶ 140. But it was *dicta* in the sense of being unnecessary to the court's decision.

[19] The same thing holds for our decision in *Thurnwald v. A.E.*, 2007 UT 38, 163 P.3d 623, cited by the dissent as another instance in which we employed the strict scrutiny standard to reform a "provision of the Adoption Act." *Infra* ¶ 136 n.166 (Nehring, J., dissenting). The *Thurnwald* opinion does include some language invoking the strict scrutiny standard from *Wells*. *Thurnwald*, 2007 UT ¶¶ 28, 35. But the ultimate holding of *Thurnwald* is one of constitutional avoidance—of statutory interpretation of the Adoption Act in light of Utah Rule of Civil Procedure 6 in a manner *avoiding* a potential problem of unconstitutionality. *See id.* ¶¶ 46–47 (emphasizing our approach of choosing one interpretation of a statute over another, and specifically of selecting an interpretation that avoided the result of striking down the Adoption Act as unconstitutional). So our invocation of strict scrutiny in *Thurnwald* is even more clearly an instance of dicta, and in any event a dictum again at odds with our other recent opinions.

¶51   Third, the *Wells* opinion offers shaky support for its heightened standard of scrutiny, while our analysis in *T.B.* and *Baby Girl T.* is in line with our current understanding of the law of substantive due process. The linchpin of the analysis in *Wells* is the assertion that parental rights are fundamental. From that premise the *Wells* court concluded that the standard was a heightened one. Thus, the *Wells* court reasoned "[b]y analogy" to a case implicating the fundamental right to travel (*In re Boyer*, 636 P.2d at 1087-88) that a statutory regulation of the right of an unwed father was an infringement of a "fundamental right." *Wells*, 681 P.2d at 206. But that conclusion was circular, or at least a bit too facile. Under the universal understanding in place at the time of *Wells* (and still today), an unwed father's right was not necessarily fundamental; it was only provisionally so, subject to being perfected by fulfillment of a state's statutory requirements for its establishment. *See Lehr*, 463 U.S. at 261–62 (the "mere existence of a biological link does not merit equivalent constitutional protection," a putative father must "grasp [the] opportunity and accept some measure of responsibility"); *In re Adoption of T.B.*, 2010 UT 42, ¶ 26 & n.22 (putative father's parental rights are provisional rights he "may acquire" by "satisfying certain statutory requirements"); *Wells*, 681 P.2d at 206 (unwed father's right to a relationship with his newborn is "a provisional right" subject to statutory perfection). Thus, under long-settled law, the right of the unwed father in *Wells* was not properly described as "fundamental" at the threshold point of identifying the applicable standard of scrutiny. Deeming it so was question-begging. So to be true to the settled understanding of the nature of the right of an unwed father, *Wells* should have carefully considered whether the unwed father in that case had established his fundamental right as a parent instead of simply assuming that he had.

¶52   That careful analysis, moreover, should have followed the approach modeled in *J.P.*, as informed by the United States Supreme Court decisions culminating in *Lehr*. And that approach is not simply to *assume at the highest level of generality* that an unwed father's interests are fundamental. It is to ask instead the more specific question whether *the precise interest at stake* is fundamental in the sense of being justified not by the mere "abstract formula[]" informed by a judge's instincts of fairness, but by a clear indication that that interest is "deeply rooted in this Nation's history and tradition and in the history and culture of Western civiliza-

tion." *In re J.P.*, 648 P.2d at 1374–75 (internal quotation marks omitted); *see also Glucksberg*¸ 521 U.S. at 728 (statute prohibiting assisted suicide constitutional because assisted suicide is not a fundamental right deeply rooted in American tradition).

¶53 Absent such evidence, the right at stake is not fundamental, and the applicable standard of scrutiny is a highly deferential inquiry into rationality or arbitrariness. That is the evident basis for the standards we adopted in *T.B.* and *Baby Girl T.* In the absence of any proof of a showing of "deeply rooted" history and tradition sustaining the unwed father's interests, we simply considered only the rationality or arbitrariness of statutory terms for an unwed father's establishment of his parental rights. And we deemed that deferential standard met where the statutory framework provided a reasonable or meaningful opportunity for a father to establish his rights. *See In re Baby Girl T.*, 2012 UT 78, ¶ 11 (due process requires only that unwed father have "meaningful chance"); *In re Adoption of T.B.*, 2010 UT 42, ¶ 31 (due process satisfied where "meaningful chance" or "reasonable opportunity" exists).

¶54 The required showing of "deeply rooted" history and tradition was made in *J.P.*, but not in *Wells*. *J.P.* concerned the question of a mother's right to maintain her parental rights absent proof of unfitness, abandonment, or neglect. 648 P.2d at 1375. And on that point the evidence of a deeply embedded history and tradition was powerful. Thus, as a predicate to recognizing a fundamental right in *J.P.*, the court relied on widespread historical evidence of a longstanding tradition of respecting a parent's custodial rights except upon proof of unfitness, abandonment, or neglect. *Id*. at 1374.

¶55 No such historical record was presented in *Wells*. The *Wells* court cited no established tradition of recognizing an unwed father's inherent right to his child without regard to any compliance with statutory prerequisites such as a paternity filing. Instead the court simply asserted, at the highest level of generality, that parental rights and familial bonds are significant, and thus that those rights are "fundamental" and accordingly subject to "a more stringent standard." *Wells*, 681 P.2d at 202, 206. In so concluding, moreover, the *Wells* court also acknowledged that the rights of an unwed father are merely "provisional," and therefore subject to forfeiture absent fulfillment of the preconditions to their eventual fulfillment. *Id*. at 205–08 (citing *Lehr*, 463 U.S. at 249). And absent

evidence of a specific tradition of respecting the rights of unwed fathers without fulfilling statutory prerequisites, the *Wells* opinion essentially assumed away the problem by simply presuming that the right in question was fundamental.[20]

¶56 The heightened standard in *Wells* was not justified by the record and authority presented. Absent a record of a deeply embedded tradition of protecting the unwed father's rights regardless of the fulfillment of any preconditions prescribed by statute, our court was in no position to declare the right in *Wells* a "fundamental" one. We should instead have simply concluded, as we more recently have done in *T.B.* and *Baby Girl T*, that the standard was the deferential, fallback standard of rationality or arbitrariness.

¶57 For these reasons, we would repudiate the heightened scrutiny standard announced in *Wells*. In our view, the standard requires more than a broad, general assertion that parental rights

---

[20] The dissent commits a similar error. It broadly asserts that "a father's right to control his children has a strong basis in American and English history," citing caselaw and other authority in support of the general respect our society has ceded to parental rights. *Infra* ¶ 134 (Nehring, J., dissenting). But that is insufficient. A general tradition of respect for parental rights comes nowhere close to establishing a fundamental right for unwed fathers to unfettered control of their offspring. That proposition is thoroughly undermined by the United States Supreme Court's decisions in *Lehr* and its antecedents and in our decision in *J.P.*, and the dissent's evidence of tradition and history is therefore inadequate.

Thus, *Hibbette v. Baines*, 29 So. 80 (Miss. 1900), does not establish a "deeply rooted" historical tradition of respecting the rights of unwed fathers. *Infra* ¶ 134. Indeed, the father in *Hibbette* was not unwed but married to the mother of his children, and the case established only his rights to custody upon the death of the children's mother in a custody contest with "collateral relatives" (a grandmother and aunts). 29 So. at 81–82. So the "presumption" of a father's right to his children recognized in *Hibbette* says nothing about such a right in a case of an unwed father like this one. And it certainly doesn't undermine the long-settled understanding of an unwed father's right as merely *provisional*.

are significant and traditionally respected. To trigger such a standard, a party would have to make the more specific showing presented in *J.P.*—to establish a specific showing that the precise interest asserted by the parent is one that is "deeply rooted in this Nation's history and tradition and in the history and culture of Western civilization." *In re J.P.*, 648 P.2d at 1374–75 (internal quotation marks omitted).[21]

### 3. Bolden's Substantive Due Process Claim

¶58 That leaves only the question of the viability of Bolden's particular claim of an infringement of his rights of substantive due process. We conclude that he has failed to make the kind of showing rooted in settled history and tradition, and thus that his claim is subject only to review for rationality or arbitrariness. And because we find the statutory gateway to establish his parental rights to be a rational, meaningful opportunity, we reject his claim and uphold the statute's constitutionality.

¶59 Bolden fails to present any historical basis for rooting the right he asserts in "this Nation's history and tradition" or in "the

---

[21] That showing, moreover, cannot be made by bare citation to *Troxel v. Granville*, 530 U.S. 57, 65 (2000), which the dissent cites in support of the notion that the interest of parents "in the care, custody, and control of their children is 'perhaps the oldest of the fundamental liberty interests' recognized by the United States Supreme Court." *Infra* ¶¶ 86, 131 (Nehring, J., dissenting). The *Troxel* opinion comes nowhere close to establishing a generalized, fundamental right of an unwed father. Instead, *Troxel* vindicates only the established right of a mother to trump the visitation rights asserted by grandparents under a state statute granting such rights upon proof that it is in "'the best interest of the child.'" *Id.* at 60 (quoting WASH. REV. CODE § 26.10.160(3)). *Troxel* does so, moreover, only on the basis of established history, tradition, and precedent supporting the principle of a fundamental right of an established parent "to make decisions concerning the care, custody, and control of their children." *Id.* at 66. None of the cited history, tradition, or precedent sustains the right asserted by Bolden and recognized by the dissent. Instead, for unwed fathers, the relevant history, tradition, and precedent establishes only a provisional right, subject to reasonable regulation by the states.

history and culture of Western civilization." *In re J.P.*, 648 P.2d at 1375 (internal quotation marks omitted). His briefs make no effort to identify any longstanding, widespread basis in our history and culture for recognizing a perfected right in unmarried biological fathers arising upon their mere filing of a paternity suit (and without following other requirements set forth by law).[22] Instead, the right asserted by Bolden implicates the slippery slope problems associated with "substantive due process innovations undisciplined by any but abstract formulae." *Id.*

¶60 Bolden insists that his interest is "more than a mere biological connection to his newborn son." But he offers "[no] principled basis for confining the right" that he asserts. *Glucksberg*, 521 U.S. at 733, n.23. Endorsement of a substantive right in this case would inevitably lead to a series of line-drawing problems going forward, requiring the courts to make policy judgments about whether the biological father before the court had done enough to properly justify the recognition of his parental rights.

¶61 Those policy judgments are matters for legislative action. Our legislature has spoken to this question, prescribing a series of prerequisites to an unmarried biological father's perfection of his inchoate interest in his child. Bolden asks us to second-guess those requirements (at least one of them). He asks us to establish a substantive due process right to perfect his parental rights on something less than the grounds prescribed by the legislature—by filing a paternity action but not the affidavit called for by statute. Doing so would put us in the problematic realm of making "due

---

[22] The dissent complains that this formulation is not Bolden's. *Infra* ¶ 129 (Nehring, J., dissenting). Fair enough. Bolden has not deigned to frame his due process claim in these clear terms. But that is just because he prefers to frame it at too-high a level of generality, anticipating that a more general statement of his interest might persuade us to embrace it. The question, however, is not the terms that Bolden has chosen to articulate his asserted right. It is the actual nature of the right in question. And there is no question that to succeed, Bolden would have to do more than establish a generic interest in parenthood. He would have to establish the precise interest that he advocates for, which is that of assuring his interests in his child without complying with the statute.

process innovations" dictated by "abstract formulae" and without any effective limiting principle.

¶62 Bolden's claim is thus subject only to deferential review of the rationality or non-arbitrariness of the statutory scheme, or in other words, of whether the statute preserves a meaningful opportunity for him to perfect his parental rights. Under that standard his claim fails, as he has made no attempt to suggest that the affidavit requirement is arbitrary or that the opportunity afforded to him by statute is not meaningful.

¶63 Instead he just claims that he ignored the statute on the (bad) advice of counsel. If so, that is unfortunate. But bad legal advice is no excuse for a failure to follow the law. For better or worse, our legal system treats attorneys as agents for their clients. And on that basis, we generally deem clients responsible for the decisions they make on advice of counsel.

¶64 There is an exception to this rule: In criminal cases, defendants convicted upon objectively deficient advice at trial may be entitled to a new trial as a remedy on a constitutional claim for ineffective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 691–92 (1984) (to prevail on ineffective assistance of counsel claim defendant must show deficient performance by counsel that was objectively unreasonable and prejudicial). But the exception proves the rule. Except in these limited circumstances, a misstep on advice of counsel is still a misstep, and a client's recourse is simply an action for malpractice. *See Jennings v. Stoker*, 652 P.2d 912, 913 (Utah 1982) (general rule in civil cases is that judgment of district or trial court will stand despite incompetence or negligence of one's own counsel); *Peterson v. Peterson*, 2006 UT App 199U, para. 9 (memorandum decision) (malpractice action is the "appropriate remedy for the client whose counsel's performance falls below the standard of professional competence" (internal quotation marks omitted)). That reality is less than ideal, particularly in cases like this one where money damages are cold comfort for the injury associated with the loss of parental rights. But that is the law—and perhaps a reminder that our system is imperfect, and that the remedies it affords may fall short of the ideal of restoring the losses suffered by the wronged.

¶65 Bolden's due process claim accordingly fails under the applicable standard of scrutiny. We therefore affirm the district court's denial of this claim.

### B. Uniform Operation and Equal Protection

¶66 The Uniform Operation Clause of the Utah Constitution states that "[a]ll laws of a general nature shall have uniform operation." UTAH CONST. art I, § 24. As we explained in *State v. Canton*, uniform operation provisions historically were understood to be aimed "not at legislative *classification* but at practical *operation*." 2013 UT 44, ¶ 34 & n.7, 308 P.3d 517. Thus, under this historical approach, the uniform operation guarantee is "not viewed as a limit on the sorts of classifications that a legislative body could draw in the first instance, but as a rule of uniformity in the actual application of such classifications." *Canton*, 2013 UT 44, ¶ 34. Bolden asserts no tenable infringement of this guarantee. His complaint is with legislative classification, not practical operation.

¶67 Bolden's claim thus arises under the modern notion of "uniform operation," which is simply a "state-law counterpart to the federal Equal Protection Clause." *Id.* ¶ 35. Under this formulation, we employ a three-step test wherein we assess: (1) "what classifications," if any, "the statute creates," (2) "whether different classes . . . are treated disparately," and (3) if there is disparate treatment, "whether the legislature had any reasonable objective that warrants the disparity." *Id.* (alteration in original) (quoting *State v. Angilau*, 2011 UT 3, ¶ 21, 245 P.3d 745).

¶68 Most classifications are presumptively permissible and thus subject to rational basis review. *Canton*, 2013 UT 44, ¶ 36 (citing *State v. Robinson*, 2011 UT 30, ¶ 22, 254 P.3d 183). Other classifications, however, "are so generally problematic (and so unlikely to be reasonable) that they trigger heightened scrutiny." *Id.* Such "suspect" classes include race, sex, and classifications implicating fundamental rights. *See Robinson*, 2011 UT 30, ¶ 22.

¶69 Not all "suspect" classifications are treated identically, however. For one thing, sex-based classifications are evaluated under a less-searching standard than that applied to race-based ones. Thus, race-based classifications are evaluated under a standard of strict scrutiny (requiring a *compelling* governmental inter-

est advanced by the *least restrictive means* possible[23]), while sex-based classifications are evaluated as a matter of intermediate scrutiny (requiring only an *important* governmental interest that is *substantially* advanced by the legislation).[24]

¶70 Second, not all sex-based classifications implicate the same considerations under this intermediate standard of scrutiny. The notion of a "substantial" relation between means and ends implies a threshold consideration of the nature and extent of the discrimination at issue. For "official action that closes a door or denies opportunity to women (or to men)," it is difficult for the government to show that its discriminatory policy "substantially" advances an important objective. *United States v. Virginia*, 518 U.S. 515, 532 (1996) (concluding that Virginia failed to carry this burden in failing to identify an "exceedingly persuasive" justification for its policy of excluding women from Virginia Military Institute). On the other hand, for official action that is less imposing, the operative standard will be easier to satisfy. *See Nguyen v. I.N.S.*, 533 U.S. 53, 70 (2001) (explaining, in upholding federal immigration rule requiring unwed fathers of children born abroad to satisfy standards not imposed on unwed mothers, that the court is "mindful" that the "obligation" imposed on fathers "is minimal"). This is

---

[23] *Parents Involved in Cmty. Schs. v. Seattle Sch. Dist. No. 1*, 551 U.S. 701, 720 (2007) ("It is well established that when the government distributes burdens or benefits on the basis of individual racial classifications, that action is reviewed under strict scrutiny. . . . In order to satisfy this searching standard of review, the [government] must demonstrate that the use of individual racial classifications . . . is narrowly tailored to achieve a compelling government interest." (internal quotation marks omitted)).

[24] *See Nguyen v. I.N.S.*, 533 U.S. 53, 60 (2001) ("For a gender-based classification to withstand equal protection scrutiny, it must be established at least that the [challenged] classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives." (alteration in original) (internal quotation marks omitted)); *State v. Hererra*, 895 P.2d 359, 384 (Utah 1995) (discrimination must "substantially further a legitimate legislative interest" to comply with Uniform Operation Clause of the Utah State Constitution).

particularly true where the differential treatment of men and women is rooted in "[i]nherent differences" between the sexes, and where such differences translate not into an outright bar on one of the sexes, *see Virginia*, 518 U.S. at 532–33 (internal quotation marks omitted), but a regime preserving meaningful opportunities to both sexes, *see Lehr v. Robertson*, 463 U.S. 248, 267 (1983) (holding that where a father had no established relationship with his child and had failed to file with the putative father registry, "nothing in the Equal Protection Clause [would] preclude[] the State from withholding from him the privilege of vetoing the adoption of that child" (alteration in original) (internal quotations omitted)); *Friehe v. Schaad*, 545 N.W.2d 740 (Neb. 1996) (holding that it was not a violation of equal protection to require a father to file with the putative father registry within five days of his child's birth or lose the right to object to an adoption).[25]

¶71 In any event, the intermediate standard of scrutiny does not require a precise fit between means and ends. A simple "substantial" relation will do, and that standard does not require proof that the official action adopted by government is the "least restrictive means" of accomplishing the government's objectives. *See Nguyen*, 533 U.S. at 70 ("None of our gender-based classification equal protection cases have required that the statute under consideration must be capable of achieving its ultimate objective in every instance.").

¶72 We apply this standard to the affidavit requirement in section 78B-6-121(3). And we uphold it as constitutional. First, we acknowledge that the statute discriminates on the basis of sex. Within the class of unmarried parents, the statute prescribes the requirement of an affidavit only for men. That is a sex-based classification triggering an intermediate scrutiny standard of scrutiny.

---

[25] Our point is not to establish two distinct standards of intermediate scrutiny. *See infra* ¶ 148 (Parrish, J., dissenting) (noting that the United States Supreme Court "has articulated only one definition of intermediate scrutiny applicable in sex discrimination cases"); *infra* ¶ 87 (Nehring, J., dissenting) (claiming that we "fail[] to actually engage in a heightened scrutiny analysis"). It is simply to note, as the United States Supreme Court has, the relevance of the degree of government discrimination in the application of the standard of intermediate scrutiny.

¶73 That said, it is important to recognize the nature and extent of the classification at issue. This is not a statute that "closes a door or denies opportunity" to men outright. *Virginia*, 518 U.S. at 532. Instead, this provision preserves meaningful opportunities for both sexes, and the threshold basis for its differential treatment of men and women stems initially not from an outmoded stereotype but from a straightforward matter of biology. It bears emphasizing, moreover, that the requirement the statute imposes on men is straightforward and quite simple. *See Nguyen*, 533 U.S. at 70 (noting the relevance of the "minimal" obligations imposed on unwed fathers under federal immigration law). And we reiterate that the standard of intermediate scrutiny does not require a closely tailored fit between means and ends. Only a "substantial" fit is required—a showing that the important ends of government are substantially advanced by the statute.

¶74 We uphold the statute under this standard. The overarching, important governmental objective is clearly prescribed by statute—the preservation of the "best interests" of children. *See* UTAH CODE § 78B-6-102(1). That objective is among the most important of any in our society.[26]

¶75 To make this objective a reality, moreover, the government has long pursued ancillary goals of great significance—of prescribing laws and procedures aimed at establishing binding connections between children and parents, either through a child's natural parents or through adoption.[27] In either setting, the State has a twofold interest—of promptly identifying those who might be designated as parents, and of reliably[28] ensuring that such per-

---

[26] *See Palmore v. Sidoti*, 466 U.S. 429, 433 (1984) ("The State, of course, has a duty of the highest order to protect the interests of minor children . . . .").

[27] UTAH CODE § 78B-6-102(5)(a) ("[T]he state has a compelling interest in providing stable and permanent homes for adoptive children in a prompt manner, in preventing the disruption of adoptive placements, and in holding parents accountable for meeting the needs of children").

[28] Our point is emphatically *not* to suggest that fathers are inherently unreliable or untrustworthy. *Infra* ¶ 87 (Nehring, J., dissenting) (contending that we "embrace the stereotype that unwed

sons will fulfill their parental role.[29] To further those goals, more-over, the state has a subsidiary interest in giving voice to those with a demonstrated commitment to the best interests of the child—to allow them to either step forward to assert their interest in parenting a child or, if not, to express their willingness to relin-quish their rights of parenthood by consenting to an adoption.[30]

---

fathers are inherently less reliable" who must "take extra steps to ensure the State that their desire to parent (and ability to parent) is *reliable* and genuine"). It is simply that the affidavit requirement is the state's attempt to create a *procedure* that reliably does the job of indicating who has parental rights and standing to object to an adoption.

[29] *See Wells*, 681 P.2d at 203 (stating that the state has a "strong interest in speedily identifying those persons who will assume the parental role" and promptly ascertaining whether they will "ful-fill their corresponding responsibilities"); UTAH CODE § 78B-6-102(5)(f) ("[T]he state has a compelling interest in requiring un-married biological fathers to demonstrate commitment by . . . es-tablishing legal paternity in accordance with the requirements of [the Adoption Act].").

[30] UTAH CODE § 78B-6-102(5)(b) (recognizing unmarried moth-er's "right to make timely and appropriate decisions regarding her future and the future of the child" and "to assurance regard-ing the permanence of an adoptive placement," given that she is "faced with the responsibility of making crucial decisions about the future of a newborn child"); *id.* § 102(5)(c) (recognizing that "adoptive children have a right to permanence and stability in adoptive placements"); *id.* § 102(5)(d) (recognizing that "adoptive parents have a constitutionally protected liberty and privacy in-terest in retaining custody of an adopted child"); *id.* § 102(5)(e) (recognizing that "an unmarried biological father has an inchoate interest that acquires constitutional protection only when he de-monstrates a timely and full commitment to the responsibilities of parenthood, both during pregnancy and upon the child's birth"); *id.* § 102(5)(f) (recognizing that "the state has a compelling interest in requiring unmarried biological fathers to demonstrate com-mitment by providing appropriate medical care and financial support and by establishing legal paternity, in accordance with the requirements of this chapter"); *see also Wells*, 681 P.2d at 203

¶76 Justice Nehring's dissent rejects these interests as somehow reflective of a "stereotype" that "exclude[s] or protect[s] members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior." *Infra* ¶ 94 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 725 (1982)). This analysis misses the mark on several grounds: (a) the Adoption Act excludes no one; it preserves an unwed father's right to object to an adoption upon fulfillment of straightforward statutory criteria; (b) the statute employs no presumption in favor of women, as it does not award custody to the mother, but establishes an orderly adoption proceeding in circumstances where the sole parent recognized by law has elected to relinquish parental rights and give up the child for adoption (to a couple, or even a single man or woman); and (c) the dissent confuses the threshold question of the legitimacy of the state's interests with the secondary question of the degree to which the statute in question advances those interests.[31]

---

(recognizing state's strong subsidiary interest in ascertaining "whether adoptive parents must be substituted").

[31] The Adoption Act neither elevates the status of women as preferred parents nor diminishes the status of men in that capacity. It simply establishes a mechanism for facilitating *adoption* in the circumstance in which the sole legal parent of a child (an unwed mother) elects to opt out of her right to parent and to waive that right in favor of adoption. Because the adoptive parent(s) may be a man, woman, or a married couple, *see* UTAH CODE §§ 78B-6-117(2)(b), the legislative decision at issue is not to favor mothers over fathers, but simply to clarify the framework necessary to assure that the child's interests will be protected by a parent of some sort.

An unwed father's rights are fully protected under the Adoption Act. A father who steps forward in a timely fashion and submits the required affidavit acquires more than just a seat at the adoption table. He secures the right to assert his interest as a father, and to preclude the planned adoption—regardless of whether the would-be adoptive parent is male, female, or a couple. *See id.* § 78B-6-133 (stating that a father in compliance with the statutory requirements to establish paternity may withhold consent to an adoption); *id.* § 78B-6-117(2)(b) (stating that subject to some

¶77 For these and other reasons, there is no basis for Justice Nehring's assertion that the affidavit requirement is "actually based on generalizations about men's inherent qualities as parents"—that "they are uninterested in their offspring and ill-suited or incompetent caregivers." *Infra* ¶¶ 94–95.[32] Those stereotypes are nowhere found in the interests set forth by statute or in the appellees' briefs in this case. Thus, we agree that the court is not to proceed on the basis of "justification[s] of its own invention." *Infra* ¶ 93. But it is the dissent, and not the court, that commits that mistake. The interests we analyze are those identified in our law—

---

conditions, "any single adult" may adopt a child). Accordingly, there is no basis for the supposed "implication . . . that fathers are inherently not reliable" or are somehow "lesser parents." *Infra* ¶ 87 (Nehring, J., dissenting). That implication is a product of the dissent's imagination. And it is thoroughly undermined by the above-explained structure of the adoption scheme in question.

[32] The stereotypes put forward by Justice Nehring's dissent are imported wholesale from opinions of the United States Supreme Court analyzing sex discrimination far removed from that at issue here. *See infra* ¶ 93 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718 (1982); *United States v. Virginia*, 518 U.S. 515 (1996)). The matter of excluding men from a public nursing school (*Hogan*) or of precluding women from participating in the "adversative" citizen-soldier program at Virginia Military Institute (*Virginia*) may be properly understood as rooted ultimately in stereotypes—of nursing as work unsuitable for men, *Hogan*, 458 U.S. at 729 (concluding that the school's policy "tends to perpetuate the stereotyped view of nursing as an exclusively woman's job"), or of a woman being ill-suited for combat training, *Virginia*, 518 U.S. at 550 (noting the school's position that "while some women would be suited to and interested in" the program, "VMI's adversative method would not be effective for *women as a group*" (internal quotation marks omitted)). But no such stereotype is implicated here. Instead, the threshold governmental interests at stake are those set forth above. And these objectives implicate not a stereotype but an objective distinction between unmarried parents—given that mothers are identified and legally designated as parents by virtue of their biological connection, but fathers require something more (both biologically and legally).

of protecting the best interests of children by giving voice in their adoption to those who have established a demonstrated commitment to their well-being prescribed clearly by statute. And those interests (along with their substantial advancement by the affidavit requirement) are likewise echoed in the briefs filed by appellees herein.[33]

---

[33] *See* Brief of Appellees 21–22 (asserting that unlike an unwed father, a mother's legal commitment to her child matures at birth; emphasizing that it is the mother who must "decide whether she will parent the child or whether an adoption plan will be pursued"; justifying discrimination in affidavit requirement on the basis of these differences); *id.* at 25–26 (asserting that the affidavit requirement "advances the state's strong interest in avoiding disruptive placements and protecting the right of 'an unmarried birth mother, who is faced with the responsibility of making crucial decisions about the future of the newborn child, . . . to make timely and appropriate decisions regarding her future and the future of the child'") (quoting UTAH CODE § 78B-6-102(5)(b)); *id.* at 26 (emphasizing the "courage" of a mother's decision to carry a child and "to place her child for adoption" while asserting that the mother "should not have to wonder whether the adoption may later be undone by a putative father who has not sworn under oath that he will 'assume the parental role' and 'fulfill the corresponding responsibilities'") (quoting *Wells*, 681 P.2d at 203); *id.* at 28 (asserting that the requirement of an affidavit puts unwed father on rough par with unwed mother by indicating that father "is willing to assume the parental role and fulfill . . . *corresponding* responsibilities"; also asserting that "father who does not file an affidavit does not acquire" the "weight" afforded to a mother, who have already "assume[d] the parental role" by their decisions and conduct); *id.* at 35–36 (contending that affidavit requirement substantially advances important interests and is "'narrowly tailored' because . . . 'compliance . . . is a very simple, easily understandable, and narrowly tailored process'"). To some extent our analysis expands upon the justifications identified in the law and by the appellees, but we find nothing in the logic or terms of the governing caselaw to limit our thinking to the precise bounds and terms of the parties' briefs. Such a restriction would be more than a little troubling. On a matter as significant as judging the constitutionality of a duly enacted statute, surely our judges are expected to ex-

¶78 The affidavit requirement in Utah Code section 78B-6-121(3) can be upheld as substantially advancing these important objectives. An unwed mother's connection to her child is objectively apparent. It is also substantial. By electing to carry the child to term (and not ending it by abortion or emergency contraception), a mother gives an objective indication of her commitment to the best interests of her child.[34] Our law has long-recognized the

ercise independent judgment and are not slaves to the precise terms and analysis of the parties' briefs.

[34] Our point is different from the one Justice Nehring's dissent addresses. Thus, we are not suggesting that the mother's acts are a precise parallel to the unwed father's burden (of filing the affidavit), or that either parent's acts provide an ironclad assurance that they will "care for the child *after* it is born." *Infra* ¶ 107. The degree of parallelism between the mother's and father's commitment does not exactly lend itself to precise mathematical comparison. But we are unwilling to denigrate the level of commitment inherent in the decision to carry a child to term, or to gainsay the difficulty of pregnancy or the availability of measures for ending a pregnancy. *See infra* ¶ 108 (questioning whether "a woman's so-called 'voluntary decision' to carry the baby to term 'express[es]' anything about . . . her commitment to the child's best interest after it is born"). And whatever level of commitment that decision entails, it bears emphasizing that the unwed father's required commitment is relatively minimal; the mere signing of an affidavit containing a "plan" for providing for a child is hardly onerous.

It is easy to hypothesize "examples of women who choose not to have an abortion but who nevertheless failed to provide the necessary care for their children." *Infra* ¶ 108, n.78. But again, the point of our analysis is not that a mother's decision to bring a child into the world is an effective guarantee. It is that the decision provides some useful information. And the shortcomings of the mother's commitment can also be extended to that of the father. We likewise do not have to look far to find examples of men who expressed a legal commitment to their children but nevertheless failed to provide the necessary care. Neither problem renders the attempt to secure a parent's commitment illegitimate. And the shortcomings of the mother's commitment are not a sufficient basis for striking down the legal requirement for the father on

significance of that commitment. It does so by deeming a mother's parental rights and responsibilities as fully matured at the time of the child's birth, in a manner giving her a voice in the child's upbringing—either to proceed as the child's parent or to relinquish her rights in consenting to an adoption.

¶79 An unwed father's role is inherently different than a mother's. His connection to his offspring may be unknown or at least indeterminate. And unlike the mother, the father has not necessarily given an objective manifestation of his commitment to the child's best interests, as his contribution may be only fleeting and incidental. This is why our law has long deemed the unwed father's rights as only inchoate or provisional—as requiring the fulfillment of legal prerequisites before being granted the rights and responsibilities of parenthood, and before being given a concomitant voice in upbringing or a decision regarding adoption.[35]

_____

grounds of unconstitutionality. The law imposes a rough-and-ready tradeoff for unwed mothers and fathers. We find the minimal imposition of the affidavit requirement to be justified by the substantial interests that it advances. *See supra* ¶ 70 (explaining the applicable standard of scrutiny, and noting that this is not a case requiring narrow tailoring, or an "exceedingly persuasive justification" for an outright bar to an opportunity for one of the sexes).

[35] Justice Nehring's denunciation of the statutory scheme is puzzling in light of the longstanding—and widespread— acceptance of this general construct in the law across the country. Our Adoption Act is hardly unique in requiring unwed fathers (but not mothers) to step forward to fulfill statutory prerequisites to the establishment of parental rights. Every state requires putative fathers to fulfill some formal requirement that is not imposed on mothers, e.g., by registering with a putative father registry or by taking some other affirmative act such as filing a paternity suit. *See* Mary Beck, *Toward a National Putative Father Registry Database*, 25 Harv. J.L. & Pub. Pol'y 1031, 1080, (2002) (detailing putative father registries in 32 states, all of which place an onus on the putative father not placed on the unwed mother); Children's Bureau, U.S. Dep't of Health & Human Servs., The Rights of Unmarried Fathers (2014), *available at* https://www.childwelfare.gov/systemwide/laws_policies/statu

tes/putative.pdf (detailing paternity statutes in all fifty states and various methods of establishing paternity whether by registration, paternity action, or paternity affidavit). Granted, there are differences in the laws of the states as to the precise nature of the father's legal duty. But the uniform rule throughout the United States is that an unwed father is required to make a formal showing—in some manner not required of unwed mothers—to establish his parental rights. Noticeably absent from the national legal landscape is a requirement of a maternity declaration for unwed birth mothers. And in that sense the discrimination that the dissent complains of is hardly an obscure feature of Utah law; it is a longstanding, well-settled element of the law across the country. So if our law can accurately be denigrated as a product of sex-based stereotyping, then the same is true of the law of essentially every other state throughout the country. The dissent's dismissive denigration of Utah law falls flat on that and other grounds.

It is a fair question to ask whether the requirements of Utah law (in particular, the filing of an affidavit) go further than necessary. But that is at heart a policy question—a matter of line-drawing, as to whether a paternity filing itself is sufficient to advance the state's interests, and to place an unwed father on equal footing with the unwed mother.

Justice Nehring takes no issue, in either his procedural or substantive due process analysis, with "other requirements" the statute imposes to ensure that an unwed father has accepted the responsibilities of parenthood. *See infra* ¶¶ 121, 131. To that extent he acknowledges that unwed fathers may properly be subjected to requirements that unwed mothers are not. *See infra* ¶ 131 (concluding that the statute's "other requirements . . . suffice to ensure that the unwed father has accepted responsibility and stepped forward as a parent"). As to another requirement that further advances this important objective, however, Justice Nehring concludes that the legislature has taken things a step too far. Reasonable minds can differ on the question whether that requirement (of an affidavit) is substantially related to ensuring the objective that all agree is important. But our disagreement on this matter can hardly justify the loaded rhetoric—of outmoded *stereotypes*,—employed by Justice Nehring *infra* ¶ 111.

¶80 The fundamental differences[36] between unwed mothers and fathers explain the basis for our statute's requirement of an affidavit for only the latter. The affidavit is defensible as an attempt to put unwed parents on equal footing. Mothers express their commitment to their offspring through the voluntary decision to carry a child to term—a decision that commits them to the statutory responsibility of caring and providing for the child as a legal parent. *See* UTAH CODE § 78B-15-201(1) (stating that the mother-child relationship is established by a "woman's having given birth to the child"); *id.* § 78B-12-105 (parents have legal duty to "support their children"). With that in mind, the Adoption Act requires unwed fathers to express a parallel commitment in the form of a written affidavit. That parallelism may not be perfect or immune from criticism as a policy matter, but it is not unconstitutional.

¶81 We uphold the statutory affidavit requirement on that basis. Thus, we hold that the requirement in Utah Code section 78B-6-121(3) substantially advances the important governmental inter-

---

[36] The relevant "differences" are not mere matters of physiology, or of any inference that "a woman's physical characteristics" sustain "generalizations about her feelings" sufficient to suggest a "greater commitment to the best interest of her child." *Infra* ¶ 111 (Nehring, J., dissenting). The point is much narrower—that a mother's decision to carry a child to term is a rough parallel to the minimal commitment expressed in a mere affidavit. Thus, we reject the dissent's characterization of Utah law as "founded in sex stereotypes," and its attempt to paint this opinion with the brush of a "long line of overruled laws and cases" evidencing such a mindset. *Infra* ¶ 111.

We can properly disagree about the wisdom of the legislature's policy decision to add a requirement of an affidavit to the nearly universal requirement of a paternity filing. And we can likewise disagree about whether our differences on that point rise to the level of a constitutional problem. But our differences go only to the complex legal questions presented. With due respect to our dissenting colleague, they are not a product of any form of sex-based stereotyping, much less our agreement with the outmoded thinking expressed in the precedent cited by Justice Nehring. *Infra* ¶ 111 & n.85.

ests identified above. It does so by assuring that any biological parent who steps forward to assert an interest in a child has manifested a commitment to the child's best interests. In light of the fact that the mother does that as an objective result of her pregnancy and delivery, the statute requires the father to do so by expressing a commitment in writing and under oath.

¶82 Both commitments are important prerequisites to the maturation of the parental right—and to the voice that accompanies such a right in the context of an adoption. Where both mother and father have provided the commitment that is legally necessary to a mature parental right, they both are in a position to participate in the decision whether to raise the child themselves or to place it for adoption. If not, however, the law treats the decision as belonging only to the parent whose rights have matured. That is constitutionally permissible, as it substantially advances the important goal of protecting the best interests of children, who are in turn substantially interested in establishing binding connections to committed parents (natural or adopted) based on informed decisions of those who have shown to have their best interests at heart.[37]

---

[37] As Justice Parrish notes in her dissent, the statute does not hold an unwed mother to the same "commitment" required of an unwed father—of attesting under oath "that he is fully able and willing to have full custody of the child," of "set[ting] forth his plans for care of the child," and of "agree[ing] to a court order of child support and the payment of [pregnancy and child birth] expenses." *Infra* ¶ 155 (Parrish, J., dissenting) (quoting UTAH CODE § 78B-6-121(3)(third alteration in original)). But this is not a basis for doubting the "fit" between the governmental interest of protecting the best interests of children and the means prescribed by statute. *Infra* ¶ 155 (Parrish, J., dissenting). It is simply a reflection of the essence of an adoption proceeding. Of course the mother who chooses to place her child with adoptive parents is not required to attest to her desire and ability to retain custody of the child, to present a plan for its care, or to subject herself to a court order to pay for its needs. We are dealing here with an adoption, in which the mother has determined that she is *not* in a position to do any of these things. So the lack of parallelism between father and mother is not an indication of a lack of fit between means and

¶83 Bolden questions the importance of these functions of the statutory affidavit, asserting that the statutory requirement of a paternity filing accomplishes approximately the same things. Justice Nehring's dissent echoes this assertion. *Infra* ¶ 102. But Bolden's paternity petition was unverified, and a signature under oath is a matter of substantial legal significance. *See State v. Gutierrez-Perez*, 2014 UT 11, ¶¶ 14–20, 323 P.3d 1017 (describing the history and significance of the constitutional requirement of an "oath or affirmation"). And in any event the prescribed elements of the affidavit are not required components of a paternity petition. Nothing in the Parentage Act imposes an unconditional requirement that a support order be entered, *see* UTAH CODE § 78B-15-616, or requires that a father state that he will accept full custody. Indeed, a determination of paternity may have nothing to do with custody. And nothing in the Parentage Act asks for a childcare plan.[38]

---

ends; it is just a reflection of the very different positions of unwed mother and father in this setting.

At the time of the child's birth, there can be no question that the mother's demonstrated commitment to the child is disproportionate to the father's. And at that point, it cannot properly be said that the mother has provided *no indication* of any "forward-looking commitment to her child," or that the father has shown an "identical level of commitment." *Infra* ¶ 156 (Parrish, J., dissenting). Surely the mother's sacrifice in carrying the child to term is some indication of her commitment to the child's best interests. *See supra* ¶ 78. And without some affirmative requirement of a commitment by the father (through the statutory affidavit, for example), it cannot properly be said that the mother and father are on equal footing. We can disagree with the legislature about the best place to draw the line. But our disagreements on line-drawing do not establish the unconstitutionality of the statutory scheme under a standard that does not require a precise fit between means and ends.

[38] Justice Nehring's dissent challenges the element of a childcare plan in the affidavit requirement, noting that there is nothing in a mother's commitment to her child that requires an explicit plan. *Infra* ¶ 107 (Nehring, J., dissenting). Yet, that concern discounts the fact that a mother's legal obligations as a parent neces-

¶84 Thus, the affidavit advances important functions that are not addressed by the paternity action alone. We uphold the statute on that basis, and accordingly affirm the denial of Bolden's motion to intervene in the adoption proceedings herein.

---

sitate some sort of plan as a practical matter. In any event, Bolden is in no position to complain about the particular *elements* of the affidavit requirement, as he failed to file *any affidavit* at all. And ultimately, the dissent's argument again misperceives the governing legal standard. The question is not one of *narrow tailoring*; the required fit between means and ends is only a matter of *substantiality*, and we find the rough comparability between the mother's expression of commitment and planning and that required of the father to be sufficient.

ASSOCIATE CHIEF JUSTICE NEHRING, dissenting:

## INTRODUCTION

¶85    I dissent.  First, Utah Code section 78B-6-121(3)(b) un-constitutional*ly discriminates on the basi*s of gender stereotypes and is thus repugnant to the principle of equal protection enshrined in both the United States Constitution and the Utah Constitution. Second, the majority refuses to analyze Mr. Bolden's claim under procedural due process at all.  Finally, the majority fails to employ strict scrutiny review despite the fact that section 78B-*6-12*1(3)(B) Infringes upon Mr. Bolden's fundamental parental rights.  Although I believe the statute is unconstitutional primarily as a violation of equal protection, I also dissent because the affidavit requirement violates the Due Process Clause where it infringes on Mr. Bolden's fundamental parental rights but is not narrowly tailored to serve a compelling government interest.

¶86    "The relationship between parent and child is protected by the federal and state constitutions."[1]  Among the persons entitled to protection are unmarried fathers.[2]  The liberty interest of parents in the care, custody, and control of their children "is perhaps the oldest of the fundamental liberty interests" recognized by the United States Supreme Court.[3]  Mr. Bolden challenges Utah Code section 78B-6-121(3)(b) — the affidavit requirement — as a violation of both due process and equal protection under the United States Constitution and the Utah Constitution.  I would hold that (1) Utah Code section 78B-6-121(3)(b) unconstitutionally discriminates on the basis of gender stereotypes and thus fails to survive intermediate scrutiny under the Equal Protection Clause, (2) as applied to Mr. Bolden, the process set forth in section 78B-6-121(3) is fundamentally unfair and thus a deprivation of procedural due process, and (3) section 121(3) infringes upon a fundamental right and is unconstitutional under strict scrutiny review.

----

[1] *Wells v. Children's Aid Soc'y*, 681 P.2d 199, 202 (Utah 1984).

[2] *Lehr v. Robertson*, 463 U.S. 248, 261 (1983); *Caban v. Mohammed,* 441 U.S. 380, 394 (1979); *Stanley v. Illinois*, 405 U.S. 645 (1972); *Thurnwald v. A.E.,* 2007 UT 38, ¶¶ 25, 28, 163 P.3d 623; *Wells*, 681 P.2d at 202.

[3] *Troxel v. Granville*, 530 U.S. 57, 65 (2000); *see also Meyer v. Nebraska*, 262 U.S. 390, 399, 401 (1923).

## ANALYSIS

### I.  UTAH CODE SECTION 78B-6-121(3)(b) UNCONSTITUTIONALLY DISCRIMINATES ON THE BASIS OF SEX

¶87     I dissent because I believe the affidavit requirement violates equal protection.  It does so primarily by discriminating between the sexes on the basis of gender stereotypes and failing to satisfy the heightened scrutiny standard.  To its credit, the majority acknowledges that section 78B-6-121(3)(b) discriminates on the basis of sex.  The majority accurately explains that sex is a suspect class that is "so generally problematic (and so unlikely to be reasonable)" that it "trigger[s] heightened scrutiny."[4]  Unfortunately, the majority's successful application of the heightened scrutiny standard ends there.  Though the majority pays lip service to the proper standard, it fails to actually engage in a heightened scrutiny analysis.[5]  I respectfully dissent because I believe the majority (1) fails to conduct a searching inquiry into the actual purposes behind the legislation and does not ferret out the stereotypes that underlie it, (2) fails to require the Does to bear their burden to justify the discriminatory classification, and (3) fails to recognize that the statute is not related to any important government purpose where it both stems from gender stereotypes and is duplicative of other statutory requirements.

¶88     The United States Constitution provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal pro-

---

[4] *Supra* ¶ 68; *Nguyen v. I.N.S.*, 533 U.S. 53, 60 (2001); *see also Utah Safe to Learn-Safe to Worship Coalition, Inc. v. State*, 2004 UT 32, ¶ 31, 94 P.3d 217 ("Where a legislative enactment implicates a fundamental or critical right or creates classifications which are considered impermissible or suspect in the abstract, we apply a heightened degree of scrutiny." (internal quotation marks omitted)).

[5] As adeptly explained by Justice Parrish in her dissent, the majority mangles the heightened scrutiny test by applying a lesser standard that closely resembles rational basis review.  *See supra* ¶ 90 ("[I]t appears to me that the majority opinion's formulation of the lower level of intermediate scrutiny it applies is, in practice, virtually indistinguishable from . . . rational basis review . . . .").

tection of the laws,"[6] and the Utah Constitution guarantees that "[a]ll laws of a general nature shall have uniform operation."[7] "[T]hese two constitutional provisions embody the same general principle:  persons similarly situated should be treated similarly . . . ."[8]  Although the uniform operation of laws provision of the Utah Constitution "establishes different requirements from the federal Equal Protection Clause," Utah's uniform operation of the laws provision is "at least as exacting, and in some circumstances, *more rigorous* than the standard applied under the federal constitution."[9]  Therefore, any provision that fails to meet the federal equal protection standard would likewise fail under article I, section 24 of the Utah Constitution, and some provisions that survive under federal law might fail under the Utah Constitution.  Because Utah Code section 78B-6-121(3)(b) (the affidavit requirement) discriminates against men without adequate justification and on the basis of invidious gender stereotypes, I would hold that it violates the principles of equal protection enshrined in both constitutions.

¶89     Utah Code section 78B-6-121(3)(b) states that an unmarried father's infant may be adopted without his consent unless he files a "sworn affidavit" (1) "stating that he is fully able and willing to have full custody of the child," (2) "setting forth his plans for care of the child," and (3) "agreeing to a court order of child support and the payment of expenses incurred in connection with

---

[6] U.S. CONST. amend. XIV, § 1.

[7] UTAH CONST. art. I, § 24.

[8] *Gallivan v. Walker*, 2002 UT 89, ¶ 31, 54 P.3d 1069 (internal quotation marks omitted).

[9] *Whitmer v. City of Lindon*, 943 P.2d 226, 230 (Utah 1997) (emphasis added) (internal quotation marks omitted); *see also State v. Drej*, 2010 UT 35, ¶ 34 n.6, 233 P.3d 476 ("Rather than conforming to the federal rubric, we have developed two levels of scrutiny for our analysis of the constitutionality of a statutory scheme under the uniform operation of laws provision."); *Greenwood v. City of N. Salt Lake*, 817 P.2d 816, 821 (Utah 1991) (stating that the test under article I, section 24 of the Utah Constitution is "somewhat more restrictive than the federal test").

the mother's pregnancy and the child's birth."[10]    The unwed mother is not required to file an affidavit.

¶90    Because Utah Code section 78B-6-121(3)(b) facially discriminates on the basis of sex, it can be upheld only if the classification (1) serves "important governmental objectives" and (2) "the discriminatory means employed are substantially related to the achievement of those objectives."[11] Today the court completely abandons this test in favor of a vision of equal protection that allows discriminatory laws to be upheld when the court believes that the discriminatory requirement is "straightforward and quite simple," "relatively minimal," and "hardly onerous."[12] But a consideration of the severity of the harm to the discriminated-against class is an improper consideration that has no role in the equal protection analysis.[13]    It does not matter how "simple" or

---

[10] The unmarried father must also satisfy three other requirements:  He must (1) initiate proceedings to establish paternity in a Utah district court, (2) file notice of the commencement of paternity proceedings with the Department of Health, and (3) offer to pay and pay (if possible) "a fair and reasonable amount of the expenses incurred in connection with the mother's pregnancy and the child's birth."  UTAH CODE § 78B-6-121(3)(a), (c)–(d).

[11] *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (internal quotation marks omitted); *Nguyen*, 533 U.S. at 60; *United States v. Virginia*, 518 U.S. 515, 533 (1996).

[12] *Supra* ¶¶ 73, 78 n.34; *see also supra* ¶ 4 (describing the affidavit requirement as "a minor step" and a "simple, straightforward hurdle" that "countless unwed fathers have cleared").

[13] *See, e.g.*, *Baskin v. Bogan*, 766 F.3d 648, 656 (7th Cir. 2014) ("When a statute discriminates against a protected class[,] . . . it doesn't matter whether the harm inflicted by the discrimination is a grave harm . . . . [A] statute that imposed a $2 tax on women but not men would be struck down unless there were a compelling reason for the discrimination. *It wouldn't matter that the harm to each person discriminated against was slight* . . . ."(emphasis added)). The majority also misstates *Nguyen*, 533 U.S. 53, on this point.  *Supra* ¶ 73 (citing *Nguyen* for the proposition that "it bears emphasizing . . . that the requirement the statute imposes on men is straightforward and quite simple").  *Nguyen* does not support the

NEHRING, A.C.J., dissenting

"straightforward" a discriminatory hurdle is—under the Equal Protection Clause, the government may not place *any* hurdle in front of a protected class without adequate justification. The majority also relies on an age-old justification for discrimination: that everyone else is doing it[14] —a claim which, even if it were true, does not provide a legal basis for upholding an unconstitutional law. Even if every state discriminated against men on the basis of their gender, "[m]inorities trampled on by the democratic process have recourse to the courts; the recourse is called constitutional law."[15]

---

notion that the ease with which one can comply with a discriminatory requirement is somehow significant to the basic equal protection analysis. In *Nguyen*, the court *first* found that the discrimination was substantially related to two important governmental objectives and was *not* based on stereotypes. 533 U.S. at 62–70. Only then did the Court note that the challenged requirement was also neither "unnecessary," "harsh[]," "rigid[]," nor "inordinate." *Id.* at 70–71. The implication is that even if a statute were substantially related to an important government interest, it might still fail to pass intermediate scrutiny if the means used were overly harsh, rigid, or unnecessary. But the converse is not true: a statute does not pass the primary test of equal protection simply on the basis that the discriminatory requirement is easy to comply with—and the simplicity of the burden imposed should not affect the court's analysis of the primary questions of governmental interest and substantial relation.

[14] *Supra* ¶ 79 n.35 ("[T]he discrimination that the dissent complains of is hardly an obscure feature of Utah law; it is a longstanding, well-settled element of the law across the country. So if our law can accurately be denigrated as a product of unfair sex discrimination, then the same is true of the law of essentially every other state throughout the country."); *supra* ¶ 79 n.35 ("Justice Nehring's denunciation of the statutory scheme is puzzling in light of the longstanding—and widespread—acceptance of this general construct in the law across the country. Our Adoption Act is hardly unique . . . .").

[15] *Baskin*, 766 F.3d at 671.

¶91    The United States Constitution's guarantee of equal protection of the laws is not subject to an exception for discrimination that is "minimal," pervasive, nor which imposes a "rough-and-ready tradeoff."[16]  And the guarantee of equal protection applies even to laws that do not create an "outright bar" against a protected class.[17]  As the United States Supreme Court explained in *Mississippi University for Women v. Hogan* "the party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an *exceedingly persuasive* justification for the classification."[18]  The burden of justifying a discriminatory law is "demanding" and "rests entirely" on the party seeking to uphold it.[19]

¶92    When confronted by a statute that facially discriminates on the basis of sex, the court's equal protection analysis should consist of a rigorous inquiry that answers the following two key questions.  First:  What is the governmental objective actually served by the statute, and is it an important one?  Second:  If the governmental objective is indeed important, is the discriminatory classification directly and substantially related to that objective?[20]  The majority fails to properly analyze either of these questions.  I

---

[16] *See supra* ¶ 78 n.34.

[17] *Reed v. Reed*, 404 U.S. 71 (1971) (striking down a law giving preference to men over women in administering estates); *Frontiero v. Richardson*, 411 U.S. 677 (1973) (striking down a law that provided that a woman could only claim her husband as a dependent if she submitted certain proof, whereas a man could automatically claim his wife as a dependent).  *Contra supra* ¶ 78 n.34.

[18] 458 U.S. 718, 724 (1982) (emphasis added) (internal quotation marks omitted); *see also J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 136 (1994); *Virginia*, 518 U.S. at 533.

[19] *Virginia*, 518 U.S. at 533.

[20] *Miss. Univ. for Women*, 458 U.S. at 725, 729–30 & n.16 (striking down a nursing school's policy of excluding men from admission under both parts of the equal protection test:  (1) because the "actual purpose underlying the discriminatory classification" was based on an archaic and overbroad stereotype and (2) "also because," in any event, the classification was not "substantially and directly related" to the state's "proposed" objective).

would hold that the statute fails to survive heightened scrutiny under both parts of the equal protection test.

### A. The Government Objective Served by Utah Code Section 78B-6-121(3)(b) Is Illegitimate Because it Is Based on the Stereotype That Men Are Inherently Inferior Parents

¶93     By now it is well established that legislative objectives based on gender stereotypes are not legitimate under any standard of scrutiny.[21]  To determine whether the government objective is important, the court must engage in a "searching" inquiry.[22]  It must take great care to ascertain "whether the statutory objective itself reflects archaic and stereotypic notions."[23]  If it does, "*the objective itself is illegitimate*."[24]  Yet, instead of taking "[c]are" to "ascertain[] whether" the claimed statutory objective "itself reflects archaic and stereotypic notions"[25] or "perpetuate[s]" stereotypes about men's presumed "inferiority"[26] as caretakers, the majority not only accepts the Does' asserted legislative purpose but goes so far as to provide a justification of its own invention.[27]  This is impermissible under any formulation of heightened scrutiny.  Although under the rational basis inquiry a court may uphold a law based on any conceivable legitimate government interest, under heightened scrutiny it is the proponent of the legislation's burden to articulate an important government interest and show a substantial relationship between the interest and the discriminatory means.  The "mere recitation"[28] that the

---

[21] *Id.*, 458 U.S. at 725; *Stanton v. Stanton*, 421 U.S. 7, 17 (1975).

[22] *Miss. Univ. for Women*, 458 U.S. at 728.

[23] *Id.* at 725.

[24] *Id.* (emphasis added).

[25] *Id.*

[26] *Virginia*, 518 U.S. at 534.

[27] *See supra* ¶ 75 ("[T]he state has a subsidiary interest in giving voice to those with a demonstrated commitment to the best interests of the child."). This argument is found nowhere in the Does' brief, nor can it be found in the Adoption Act's statement of legislative intent.  UTAH CODE § 78B-6-102. *See also infra* Part I.B.

[28] *Frontiero*, 411 U.S. at 690.

legislative objective is important is not enough. Here, the majority simply accepts that the government goal served by Utah Code section 78B-6-121(3)(b) is the "preservation of the best interests of children" by "establishing binding connections between children and parents."[29] But this cannot simply be accepted at face value.[30] "[B]enign justifications proffered in defense of categorical exclusions [based on sex] *will not be accepted automatically*; a tenable justification must describe actual state purposes, not rationalizations for actions in fact differently grounded."[31]

¶94      I dissent because even the most minimally "searching"[32] inquiry reveals the impermissible stereotyping at the root of Utah Code section 78B-6-121(3)(b). The majority simply accepts that the purpose of Utah Code section 78B-6-121(3)(b) is to serve the State's "compelling interest" in "holding parents accountable for meeting the needs of children."[33] But Utah Code section 78B-6-121(3)(b), by its plain terms, does not apply to "parents" — it applies to fathers. And the reason it does this is because the statute is actually based on generalizations about men's inherent qualities as parents. A statutory objective that aims to "exclude or 'protect' members of one gender because they are presumed to suffer from an inherent handicap or to be innately inferior" is an "illegitimate" objective.[34]

---

[29] *Supra* ¶¶ 74–75 (internal quotation marks omitted).

[30] *Frontiero*, 411 U.S. at 690; *see also supra* ¶¶ 92–93 (Parrish, J., dissenting).

[31] *Virginia*, 518 U.S. at 535–36 (emphasis added) (internal quotation marks omitted); *see also Gallivan*, 2002 UT 89, ¶ 37 ("[I]t is unconstitutional to single out one person or group of persons from among the larger class on the basis of a tenuous justification that has little or no merit."(internal quotation marks omitted)).

[32] *Miss. Univ. for Women*, 458 U.S. at 728.

[33] Utah Code § 78B-6-102(5)(a); *cf. id.* at 78B-6-102(5)(f) (stating that the Adoption Act aims to protect the compelling interest in children's welfare by "requiring unmarried biological *fathers* to demonstrate commitment"(emphasis added)).

[34] *Miss. Univ. for Women*, 458 U.S. at 725.

¶95    The affidavit requirement reflects a negative stereotype that is commonly wielded against unwed fathers:  that they are uninterested in their offspring and ill-suited or incompetent caregivers.  Telling language in the Does' brief captures this attitude: "The requirement to set forth his plans for the child's care shows that [the unwed father] has *at least* thought through what he would need to do to fulfill his parental responsibilities" (emphasis added).  More insight can be gleaned from the Does' quotation of *In re Adoption of Baby Boy Doe* for the proposition that the State has a legitimate interest in getting a "glimpse into how [the unwed father] will meet daily care-giving responsibilities"[35] so that the State can be assured that the unwed father will adequately fulfill the parental role.[36]  The idea that men are inherently ill-suited for caregiving and at greater risk of failing to "fulfill" basic parental responsibilities is a stereotype and thus an entirely inappropriate legislative objective.  Indeed, this stereotype is precisely the flip side of the same generalization that has long been applied to women—*i.e.*, that they are naturally well-suited for the responsibilities of childcare and the home.[37]

---

[35] *N.T. v. Doe (In re Adoption of Baby Boy Doe)*, 2008 UT App 449, ¶ 5, 199 P.3d 368.

[36] *See also supra* ¶ 83.  The majority defends the plan element of section 78B-6-121(3)(b) by asserting that a mother has "legal obligations as a parent" that "necessitate some sort of plan as a practical matter." *Supra* ¶ 83 n.38.  It is not clear why the majority believes every woman—as a mother—develops a plan to care for her child "as a practical matter" but a present, identified father who has filed for a declaration of paternity does not, and instead must set his plan out in a sworn court document. *Supra* ¶ 83 n.38.  It is certainly not true that fathers are not legally liable for neglect of their children. *See* UTAH CODE § 76-5-109 (crime of "child abandonment" includes a "parent['s]" "intentional[] fail[ure]" to "make reasonable arrangements for the safety, care, and physical custody of the child" or to "provide the child with food, shelter, or clothing").

[37] For another example of this stereotype, *see Bradwell v. Illinois*, 83 U.S. 130, 141 (1872) ("[T]he domestic sphere [is] that which properly belongs to the domain and functions of womanhood.").

¶96    The court of appeals' reasoning in *In re Adoption of Baby Boy Doe* is a perfect illustration of the improper stereotypes that infect Utah Code section 78B-6-121(3)(b).  There, the court held that an unwed father had failed to comply with Utah Code section 78B-6-121(3)(b)(ii)'s requirement that he "set[] forth his plans for care of the child."[38]  The court found that the father had not satisfied the planning requirement because he did not provide a "glimpse" into his plan for day-to-day life with the child.[39]  The court clarified its holding in a footnote:  "[W]e believe the legislature intended that the putative father at least specify that he has a source of income and identify who will care for the child *while he is working to earn that income*."[40]  This reasoning captures the "actual purposes underlying" section 78B-6-121(3): to wit, to protect children on the basis of entrenched, inaccurate, and offensive stereotypes about men's and women's innate qualities and proper roles.[41]  As the United States Supreme Court has repeatedly reaffirmed, government policies cannot reflect "archaic and overbroad generalizations about gender," "outdated misconceptions concerning the role of females in the home," or "outmoded notions of the relative capabilities of men and women."[42]

¶97    The majority's own phrasing is telling:  "[T]he statutory affidavit requirement . . . assur[es] that any biological parent who steps forward to assert an interest in a child has manifested a

---

[38] *In re Adoption of Baby Boy Doe*, 2008 UT App 449, ¶ 5.

[39] *Id.*

[40] *Id.* ¶ 5 n.2 (emphasis added).

[41] *Miss. Univ. for Women*, 458 U.S. at 728.

[42] *J.E.B.*, 511 U.S. at 135 (internal quotation marks omitted); *see also Virginia*, 518 U.S. at 533 (explaining that the state's justification "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females"); *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 441 (1985); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 643 (1975); *Stanton*, 421 U.S. at 14–15 (1975); *cf. Pusey v. Pusey*, 728 P.2d 117, 119–20 (Utah 1986) ("Discontinu[ing] our support" for "gender-based preferences in child custody cases" and holding that the maternal preference rule "lacks validity because it is unnecessary and perpetuates outdated stereotypes").

commitment to the child's best interests."[43]  Of course, because under the majority's reasoning a mother's commitment is simply assumed when the child is born,[44] when the majority says "biological *parent*," it can only mean "biological father."  Thus, the majority holds that the affidavit requirement is justified as a way of ensuring that *fathers* "reliably" indicate their ability to "fulfill their parental role."[45]  But there is no rational reason to assume that a father's ability to fulfill the parental role is any less reliable than a mother's.  The only way to accept such an assumption is to embrace the stereotype that unwed fathers are inherently less reliable parents.  It is only by accepting the stereotypes underlying section 78B-6-121(3)(b) that the majority is able to justify its conclusion that fathers may be required to take extra steps to ensure the State that their desire to parent (and ability to parent) is *reliable* and genuine.  For this reason, the majority's affirmation that an unwed father may be required to "reliably" manifest a commitment to "fulfill[ing] [his] parental role"—via sworn affidavit containing a written parenting plan—perpetuates the stereotyping at the heart of the statute.[46]

---

[43] *Supra* ¶ 81.

[44] *See supra* ¶¶ 78, 80 ("An unwed mother's connection to her child is objectively apparent. . . . Mothers express their commitment to their offspring through the voluntary decision to carry a child to term . . . .").

[45] *Supra ¶ 75 (footnote omitted).*

[46] The majority states that it "emphatically" does not intend to suggest that fathers are inherently unreliable or untrustworthy. *Supra* ¶ 75 n.28.  I do not doubt that my colleagues eschew such beliefs.  But the point remains that section 78B-6-121(3)(b) exploits those unfair stereotypes.  The majority misses the point when it describes the affidavit requirement as aimed at "indicating who has parental rights and standing," *supra* ¶ 75 n.28,—as I will explain, the affidavit requirement is not aimed at *identifying* fathers. By its own plain terms, the purpose of the affidavit requirement is specifically to require unwed fathers to (1) swear that they "are fully able and willing to have full custody," (2) "set[] forth . . . plans for care of the child," and (3) "agree[] to a court order of

¶98    The government policy represented by Utah Code section 78B-6-121(3) reflects the invidious and outdated stereotype that fathers are not only generally less interested in parenting than mothers, but in fact possess inferior abilities and instincts in that realm.  I would strike down section 78B-6-121(3)(b) on that basis and would thereby affirm "what, by now, should be axiomatic: Intentional discrimination on the basis of gender by state actors violates the Equal Protection Clause, particularly where, as here, the discrimination serves to ratify and perpetuate invidious, archaic, and overbroad stereotypes" about the innate characteristics of men and women.[47]

### B. The Affidavit Requirement Is Not Substantially Related to the Proposed Government Interest

¶99    Although I would strike down the statute as based on an illegitimate underlying purpose,[48] I write further to note that the statute is also unconstitutional because there is no "direct, substantial relationship between objective and means."[49]  Thus, even accepting the legislative purpose in its most favorable light, the discriminatory classification is not substantially related to that objective.[50]  I disagree with the majority's conclusion that the affidavit requirement "can be upheld as substantially advancing" important government interests for three reasons.  First, instead of requiring the Does to satisfy their "demanding" burden to justify the discrimination, the majority instead supplies a justification for them—this is impermissible under heightened scrutiny.  Second, the discriminatory affidavit requirement is redundant and thus cannot be "substantially related" to the goal of ensuring a father's commitment to assuming a parental role.  Third and finally, the

---

child support and the payment of expenses."  UTAH CODE § 78B-6-121(3)(b).

[47] *J.E.B.*, 511 U.S. at 130–31.

[48] *See supra* Part I.A.

[49] *Miss. Univ. for Women*, 458 U.S. at 725.

[50] *See, e.g., id.* at 730 ("The policy is invalid also because it fails the second part of the equal protection test, for the State has made no showing that the gender-based classification is substantially and directly related to its proposed . . . objective.").

physical fact of pregnancy and birth does not "express"[51] anything about a woman's inherent attitudes, intentions, or feelings. In other words, biological differences, while real, do not justify stereotypes and generalizations about women's supposedly inherent feelings toward their infants. Biological differences cannot be used to perpetuate the gender stereotypes inherent in the majority's notion that the mother, simply because she is the mother, has a special "voice"[52] that the father lacks, to decide the fate of the child.[53]

1. The Majority Fails to Require the Does to Bear Their Burden to Justify the Discriminatory Classification

¶100 Despite the fact that under heightened scrutiny the "burden of justification is demanding and it rests entirely on the State"[54] (or in this case, on the proponent of the legislation, the Does), the majority, sua sponte, supplies a justification that the Does did not proffer: that the physical differences between men and women indicate a mother's inherently greater "commitment" to her child at birth and therefore justify requiring a father to "express a parallel" commitment by swearing that he has the money,

---

[51] *Supra* ¶ 80.

[52] *Supra* ¶ 75 (state has interest in "giving voice to those with a demonstrated commitment"); ¶ 78 ("[a] mother's parental rights . . . give[] her a voice in the child's upbringing"); ¶ 82 (commitment, which mother shows simply by giving birth, is an "important prerequisite[] . . . to the voice that accompanies [the parental right] in the context of an adoption").

[53] As I point out above, the stereotype that women are inherently well-suited and competent parents implicates the mirror stereotype that men are inherently less caring, less skilled, and less invested parents.

[54] *Virginia*, 518 U.S. at 533; *Miss. Univ. for Women*, 458 U.S. at 724; *Utah Safe to Learn-Safe to Worship Coalition, Inc.*, 2004 UT 32, ¶ 24, (stating that under Utah's heightened scrutiny test "the burden of proof shifts to the State to show that a challenged provision actually and substantially furthers a valid legislative purpose and is reasonably necessary to further a legitimate legislative goal" (internal quotation marks omitted)).

the desire, and the know-how necessary to raise his child.[55]  In so doing, the majority employs a rational basis standard under the guise of heightened scrutiny.  Under rational basis review, the burden is on the one "attacking" the law to show that there is no "conceivable" legitimate interest that justifies the classification, and thus the court will uphold the law if there is any "conceivable basis which might support it."[56]  Not so for heightened scrutiny.  Under heightened scrutiny, the burden is on the proponent of the legislation to show that the actual—not merely conceivable—underlying purpose is an important one.[57]

¶101    The majority writes that the important legislative objective underlying Utah Code section 78B-6-121(3)(b) is the "preservation of the best interests of children," which it says is pursued through State efforts to establish "binding connections between children and parents"—a goal which, in turn, is accomplished by "giving voice to those with a demonstrated commitment to the best interest of the child."[58]  The majority then reasons that because a mother, by virtue of her physical role in the birth, has automatically demonstrated her commitment, the government's fathers-only affidavit requirement is justified.[59]  Although the Does listed a number of "compelling reasons" that they believe justify the affidavit requirement, "biological differences between men and women" was not one of them.  Nor is the majority's biological-differences justification found anywhere in the Adoption Act's

---

[55] *Supra* ¶ 80; UTAH CODE § 78B-6-121(3)(b).

[56] *Armour v. Indianapolis*, 132 S. Ct. 2073, 2082 (2012).

[57] *Virginia*, 518 U.S. at 533, 535–36.

[58] *Supra* ¶ 74–75 (internal quotation marks omitted).  The majority also describes the State's interest as an interest in "giving voice to those with a demonstrated commitment to the best interests of the child."  *Supra* ¶ 75.

[59] *Supra* ¶ 78 ("By electing to carry the child to term (and not ending it by abortion or emergency contraception), a mother gives an objective indication of her commitment . . . . giving her a voice in the child's upbringing . . . .").

statement of legislative intent.[60]  The justifications that the Does actually proffered are worth noting.  They are:

- The State has a "compelling interest in identifying unwed fathers who will *actually assume* the parental role and fulfill the corresponding responsibilities." (Emphasis added.).

- "[I]t is usually best for the child if the mother de-cides soon after the child's birth whether she will . . . *allow the father to raise the child* . . . . To aid the mother in making this crucial decision, it is completely un-derstandable that the Legislature would require an unwed father to make the sworn statements." (Em-phasis added.).

- "[I]t is commonplace for an unwed mother to be lulled into deciding to parent her child by false promises made by the father, only to find out too late that she alone must shoulder the entire burden . . . . A mother who has the *courage* to place *her child* for adoption should not have to wonder whether the adoption may later be undone by a putative father." (Emphasis added).

- "[I]f a man is not willing to legally commit to the mother and her future children by marrying her prior to the child's conception, it is not unduly harsh to require him to file a sworn affidavit."

- "The affidavit requirement serves the further pur-pose of ferreting out those cases were [sic] *the puta-tive father truly does not want to be responsible for the child*, but has been put up to filing a paternity action to obstruct the adoption by someone else." (Empha-sis added).

Given the quality of these assertions, perhaps it is unsurprising that the majority chose to come up with its own justification for the government interest underlying the discrimination in section 78B-6-121(3)(b).  However, under heightened scrutiny, the burden is on the proponent of the discriminatory legislation to show the

---

[60] UTAH CODE § 78B-6-102.

actual purpose behind the legislation.[61]  The majority cannot step in and attempt to relieve the Does of their burden to justify Utah Code section 78B-6-121(3)(b)—yet, the majority does exactly this by supplying the "fundamental differences" rationale.[62]  I believe that the reasons proffered by the Does successfully showed the actual purpose of the legislation—though not in the way they intended.  All of the Does' proffered justifications are based on speculation, generalization, and stereotyping.  The majority improperly attempts to reform the justifications put forward by the Does by coming up with, at best, a conceivable government objective.  Under heightened scrutiny, the majority may not do this.[63]

2.  Utah Code Section 78B-6-121(3)(b) Is Not Substantially Related to an Important Government Interest Because It Is Redundant

¶102    Even if one ignores the fact that the majority itself comes up with a government rationale justifying the discrimination and thus impermissibly relieves the proponents of the legislation of their burden to do so, and even if one accepts that the government's interest is legitimate and important, the affidavit requirement is nonetheless unconstitutional because it is redundant and unnecessary.  The affidavit requirement does not provide any meaningful additional assurance that the father is "commit[ted] to the best interests of the child"[64] beyond what is readily ascertainable by the fact that he has stepped forward, identified himself, paid expenses (or offered to do so), and filed a legally binding document in a Utah district court declaring himself the father and expressing a corresponding willingness to assume all of the legal duties and responsibilities that come with that status.  The other requirements of Utah Code section 78B-6-121(3) already show the unwed father's commitment to his baby.  Under Utah Code section 78B-6-121(3)(a), (c), and (d), the father must file a paternity petition requesting custody and explicitly expressing his commitment to his child and desire to parent that child; he must file

---

[61] *Virginia*, 518 U.S. at 535–36.

[62] *Supra* ¶ 80.  And even if this were proper, as I explain in Part I.B.3 *infra*, the majority's biological differences justification fails.

[63] *Virginia*, 518 U.S. at 533; *Miss. Univ. for Women*, 458 U.S. at 724–25.

[64] *Supra* ¶ 75.

notice of that petition with the Department of Health; and he must pay or offer to pay expenses relating to the pregnancy and birth. These actions indicate the father's commitment. Further demonstration of that commitment by the discriminatory means of the affidavit requirement does not present an "exceedingly persuasive" justification for the discrimination, especially when the affidavit is based entirely on invidious stereotypes about men's inherent parental inferiority.[65]

¶103   It is not disputed that Mr. Bolden satisfied three of the four requirements of section 78B-6-121(3). The one requirement that he did not satisfy—the affidavit requirement—does not significantly contribute to the government's important interest in protecting children or ensuring that caretakers are committed to fulfilling their parental role.

¶104   In *Nguyen v. I.N.S.*, the United States Supreme Court upheld an immigration statute that favored mothers over fathers on the basis that, due to biology, at birth the father may be unknown while the mother is easily identifiable.[66] The majority attempts to justify section 78B-6-121(3)(b) in part by alluding to this identity rationale.[67] But the affidavit requirement has nothing whatsoever to do with identifying the father, as its plain terms and the bulk of the majority's reasoning make clear—it is intended to ensure the father's "commitment" to care for the child. Moreover, other provisions of the statute amply ensure that the father is not only identified but has indicated a desire and intention to be a parent to his child, with all of the legal, moral, ethical, and practical obligations that come with that.

¶105   The other requirements of section 78B-6-121(3) ensure that the father is both identified and has "com[e] forward to par-

---

[65] As explained, the father must swear that he "at least" has a plan for how he will "financially care" for the child as well as how he will "meet daily care-giving responsibilities." *In re Adoption of Baby Boy Doe*, 2008 UT App 449, ¶ 5 & n.2; UTAH CODE § 78B-6-121(3)(b).

[66] 533 U.S. at 62–64.

[67] *See supra* ¶ 79 ("[An unwed father's] connection to his offspring may be unknown or at least indeterminate.").

ticipate in the rearing of his child."[68]   Thus, even if the government interest in ensuring a father's commitment is accepted, the affidavit requirement is unnecessary because other provisions of the Adoption Act already accomplish that goal.

3. Physical Differences Cannot Be Used to Justify Discrimination Based on Stereotypes

¶106   The majority's reference to abortion is baffling.[69]   The majority attempts to justify the discrimination wrought by section 121(3)(b) by turning to the  physical differences between men and women, seemingly inspired by the reasoning used by the Supreme Court in *Nguyen v. I.N.S.*[70]   The majority proceeds under the premise that a woman's capacity to gestate and deliver a child provides "useful information" about her attitude toward the child and commitment to its interests.[71]   But instead of citing any legal authority, the majority's reasoning on this issue appears to stem from its own beliefs about "the fundamental differences" between men and women and what mothers "express" by way of gestation and delivery.[72]   Yet the majority's attempt to use a woman's physical experience of pregnancy to stand in for and justify assump-

---

[68] *Lehr v. Robertson*, 463 U.S. 248, 261 (1983) (internal quotation marks omitted).

[69] *Supra* ¶ 78 ("By electing to carry the child to term (and not ending it by abortion or emergency contraception), a mother gives an objective indication of her commitment to the best interests of her child.").

[70] 533 U.S. at 64 (reasoning that, "[g]iven that the mother is always present at birth, but that the father need not be," a statute that employed a gender classification permissibly used "gender specific terms" because it did so merely as a way of "tak[ing] into account a biological difference between the parents," namely, the mother's "unique relationship *to the event of birth*"(emphasis added)); *supra* ¶ 78 n.34.  The reasoning in *Nguyen* is inapplicable to the statute we are faced with here because there is no inherent biological difference between mothers' and fathers' commitment to their children.  533 U.S. at 64.

[71] *Supra* ¶ 78 n.34.

[72] *Supra* ¶ 80.

tions about her "inherent" parental attitudes[73] is itself founded in stereotypes.[74]

¶107    Carrying a child to term could—but does not necessarily—indicate a mother's concern for the fetus's interest before birth.[75]  Regardless, the successful completion of pregnancy and delivery says nothing about a mother's commitment to care for the child after it is born.  In other words, carrying a child to term says nothing about a mother's ability or willingness to have custody of the child post-birth.  It says nothing about her "plan" to care for the child.  And it does not ensure that she is able to pay expenses she incurs in connection with the pregnancy and birth.  In short, the fact that a woman carries a child to term is completely unrelated to the goals of the affidavit requirement.[76]  Accor-

---

[73] *Supra* ¶ 2 ("Unwed mothers acquire parental rights—and the accompanying right to object to an adoption—as a result of the objective manifestation of the commitment to the child that is demonstrated by their decision to carry a child to term."); ¶ 78 ("By electing to carry the child to term (and not ending it by abortion or emergency contraception), a mother gives an objective indication of her commitment to the best interests of her child"); ¶ 80 ("[F]undamental differences between unwed mothers and fathers explain the basis for our statute's requirement of an affidavit for only the latter."(footnote omitted)); ¶ 78 n.34 ("[w]e are unwilling to denigrate the level of commitment inherent in the decision to carry a child to term, or to gainsay the difficulty of pregnancy"); *id.* ("[a] mother's decision to bring a child into the world . . . provides some useful information").

[74] *Cf. Nguyen*, 533 U.S. at 68 (explaining that because it is "undeniable" that the unwed mother and father's circumstances are different in terms of their need to be present at the birth and thus different in terms of the state's ability to identify them, this distinction "does not result from some stereotype, defined as a frame of mind resulting from irrational or uncritical analysis").

[75] It is not a difficult thought experiment to imagine a pregnant woman who lacks concern for her unborn child's best interest, or who, for example, is unaware that she is pregnant.

[76] *See* UTAH CODE § 78B-6-121(3)(b) (requiring unwed father to file an affidavit stating that he is "fully able and willing to have

dingly, I would hold that the gender discrimination effected by the affidavit requirement is not reasonably related to the State's objective, however that objective is framed.

¶108　The affidavit requirement not only requires the father to declare that he is "able and willing" to take full custody of his child, but also forces him to make a written "plan" for the child's care.[77]　These requirements are future-oriented.　I fail to see how the mother's decision not to get an abortion indicates anything about her ability or willingness to care for her child after it is born.　Moreover, I vehemently disagree that a woman's so-called "voluntary decision" to carry the baby to term "express[es]" anything about her plan for the child's care or her commitment to the child's best interest after it is born.[78]　For one thing, obtaining an abortion is painful, costly, time-consuming, morally and religiously fraught, and, for many women, nearly impossible or actually impossible due to age,[79] religion, geography, employment demands, or cost.　For another, the fact of being pregnant and carrying a baby to term is a physical reality that cannot rationally be used to surmise anything about the woman's internal feelings and intentions.　In short, the majority's abortion rationale is not only based on impermissible gender stereotypes, but even taken on its own terms, it is absurd and illogical.

---

full custody," "setting forth his plans for care of the child," and "agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth").

[77] *Id.*

[78] The majority attempts to conflate a woman's pre-birth action of not aborting the fetus with a post-birth commitment to the child's care.　This defies logic.　Indeed, one does not need to look far to find examples of women who chose not to have an abortion but who nevertheless failed to provide the necessary care for their children.　Regrettably, our juvenile courts are full of cases of maternal abuse and neglect.

[79] *See* UTAH CODE § 76-7-304.5(2)(a)–(b), (5) (prohibiting minors from obtaining abortions absent parental consent or judicial approval).

¶109    While it is of course true that a woman is inherently different from a man in that she can become pregnant and theoretically undergo an abortion, the majority improperly uses this difference to justify a statute that is based not on biological difference but rather on invidious stereotypes about the parenting attitudes and capabilities of men and women.[80]

¶110    The majority's assumptions about the difference in "commitment" between an unmarried mother and an unmarried father are not actually based on the physical reality of pregnancy and birth.  This is because a difference in commitment does not stem from a biological reality in the way that parental identity under *Nguyen* does.[81]  In other words, it is a biological reality that a father need not be present at birth.  It is not a biological reality that a woman is committed to the best interest of her child.

¶111    The majority uses a woman's physical characteristics to make generalizations about her feelings and assumes, based on her gender alone, that she has a greater commitment to the best interest of her child.[82]  This is a classic example of an "overbroad

---

[80] *Virginia*, 518 U.S. at 533 (stating that the State's justification for a discriminatory law "must not rely on overbroad generalizations about the different talents, capacities, or preferences of males and females"); *Caban v. Mohammed*, 441 U.S. 380, 389 (1979) ("[M]aternal and paternal roles are not invariably different in importance . . . .").

[81] 533 U.S. at 62–63 ("In the case of the father, the uncontestable fact is that he need not be present at the birth. If he is present, furthermore, that circumstance is not incontrovertible proof of fatherhood.").

[82] The majority claims that it merely uses a woman's biology as a "rough parallel" to the affidavit requirement.  *Supra* ¶ 80 n.36; *see also supra* ¶ 83 n.38 ("[W]e find the *rough comparability* between the mother's expression of commitment and planning and that required of the father to be sufficient." (emphasis added)).  But simply adding the word "rough" does not overcome the defects in the majority's reasoning—today the court holds that a woman's mere physical biology is "parallel" to a father's written, sworn statement that, among other things, he has a detailed plan to raise his child.

generalization[]" about gender.[83]  Though I do not doubt my colleagues' good intentions, the majority upholds a statute that is founded in sex stereotypes—which are "fixed notions" the different genders are better or worse suited to certain tasks, such as nurturing.[84]  Such stereotypes should have no place in our law, our courts, or our public policy.  The court today upholds a discriminatory statute on the basis of so-called innate differences between men and women.  But this reasoning ties it to a long line of overruled laws and cases.  In other words, unfair sex discrimination has long been perpetuated by arguments that sound in biology.[85]  True, cases like *Bradwell* present particularly egregious examples of gender discrimination, but the reliance on "nature" in such cases finds echoes in today's decision.  The State may not use biology to justify "classifying unwed fathers as being invariably less qualified and entitled than mothers to exercise a concerned

---

[83] *Caban*, 441 U.S. at 394 (internal quotation marks omitted); *see also Virginia*, 518 U.S. at 541 (cautioning courts to take a "hard look" at justifications for gender discrimination that rely on "generalizations or tendencies" or are "based on fixed notions concerning the roles and abilities of males and females").

[84] *Virginia*, 518 U.S. at 541; *see also id.* at 533 (describing gender stereotypes as "overbroad generalizations about the different talents, capacities, or preferences of males and females").

[85] *See, e.g.*, *Bradwell v. Illinois*, 83 U.S. 130, 141 (1872) ("[T]he civil law, as well as nature herself, has always recognized a wide difference in the respective spheres and destinies of man and woman.  Man is, or should be, woman's protector and defender. The natural and proper timidity and delicacy which belongs to the female sex evidently unfits it for many of the occupations of civil life.  The constitution of the family organization, which is founded in the divine ordinance, as well as in the nature of things, indicates the domestic sphere as that which properly belongs to the domain and functions of womanhood."); *see generally*, *Virginia*, 518 U.S. at 542–545 (explaining historical attitudes about the different roles of men and women); *Frontiero*, 411 U.S. at 684–685 ("There can be no doubt that our Nation has had a long and unfortunate history of sex discrimination. . . . [O]ur statute books gradually became laden with gross, stereotyped distinctions between the sexes . . . .").

judgment as to the fate of their children."[86]  For this reason I dissent and would strike down Utah Code section 78B-6-121(3)(b).

¶112    I also take issue with the majority's assertion that we simply "disagree about the wisdom of the legislature's policy decision to add a requirement of an affidavit."[87]  My disagreement with the majority is about the constitutionality of the statute, not the legislature's wisdom.  The majority today upholds a statute that discriminates on the basis of gender.  With all due respect, and as explained herein, the majority's decision is deeply flawed.  The majority perpetuates the sexual stereotypes embodied in Utah Code section 78B-6-121(3)(b) and its decision today has allowed unfair discrimination to remain enshrined in the laws of our State.  I would hold that because Utah Code section 7B-6-121(3)(b) treats unmarried men and unmarried women differently without justification, it unconstitutionally discriminates based on sex.

## II.  THE AFFIDAVIT REQUIREMENT VIOLATED MR. BOLDEN'S RIGHT TO THE PROTECTION OF PROCEDURAL AND SUBSTANTIVE DUE PROCESS

¶113    Mr. Bolden's challenge to the constitutionality of the affidavit requirement is a matter of first impression in this State.[88]

---

[86] *Caban*, 441 U.S. at 394; *see also Frontiero*, 411 U.S. at 686–87 ("[S]tatutory distinctions between the sexes often have the effect of invidiously relegating the entire class . . . to inferior legal status without regard to the actual capabilities of its individual members.").

[87] *Supra* ¶ 80 n.36; *see also supra* ¶ 79 n.35 ("It is a fair question to ask whether the requirements of Utah law . . . go further than necessary.  But that is at heart a policy question . . . .").

[88] Although Utah appellate courts have been presented with cases where a putative father complied with all of the requirements except the affidavit requirement, each time, the constitutionality of the affidavit requirement has evaded review.  *See Donjuan v. McDermott*, 2011 UT 72, ¶ 22, 266 P.3d 839 (putative father failed to preserve constitutional argument); *E.G. v. C.C.D. (In re Adoption of Baby Girl)*, 2010 UT App 114, ¶ 21 n.2, 233 P.3d 517 (constitutional argument not raised or preserved); *N.T. v. Doe (In re Adoption of Baby Boy Doe)*, 2008 UT App 449, ¶¶ 4–7, 199 P.3d 368 (constitutional argument not raised).  In his dissent in *In re*

Mr. Bolden concedes that he did not comply with the affidavit requirement of Utah Code section 78B-6-121(3). He challenges that requirement as a violation of due process—a challenge that includes both the procedural and substantive branches of that constitutional doctrine.

### A. Procedural Due Process

¶114 The majority baldly states that Mr. Bolden's due process claim "sounds only in substantive due process"[89] I respectfully disagree. Mr. Bolden has squarely challenged the statute under the Due Process Clause, which contains both procedural and substantive elements. The majority itself claims that the "right to due process is principally about *process*—procedure, not substance."[90] However, despite this view, and despite the majority's professed suspicion of the very notion of substantive due process,[91] the majority is nevertheless unwilling to evaluate Mr. Bolden's claim through the lens of fair process.

¶115 "A due process right of access to the courts exists when fundamental interests are present and the State has exclusive control over the adjustment of [the] legal relationships involved."[92] The United States Supreme Court has held that states may not irrationally deny people access to the courts, particularly where, as

---

*Adoption of Baby Girl*, Judge Thorne noted that the requirements of the current statute had not "been expressly approved" by this court. 2010 UT App 114, ¶ 39.

[89] *Supra* ¶ 28.

[90] *Supra* ¶ 29.

[91] *See supra* ¶ 30 (stating that "the Due Process Clause is not a license for the judicial fabrication of rights that judges might prefer, on reflection, to have been enshrined in the constitution" and citing *Regents of University of Michigan v. Ewing*, 474 U.S. 214, 225–26 (1985), for the proposition that "[a]lthough the Court regularly proceeds on the assumption that the Due Process Clause has more than a procedural dimension, we must always bear in mind that the substantive content of the Clause is suggested neither by its language nor by preconstitutional history" (internal quotation marks omitted)).

[92] *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 430 n.5 (1982).

here, "resort to the judicial process" is, "in a realistic sense," involuntary.[93] In *Logan v. Zimmerman Brush Co.*, the Court explained that "[t]he State may erect reasonable procedural requirements for triggering the right to an adjudication, be they statutes of limitations, or, in an appropriate case, filing fees," but nevertheless "what the Fourteenth Amendment does require, however, is an *opportunity* . . . granted at a meaningful time and in a meaningful manner, for [a] hearing appropriate to the nature of the case."[94] This is because "courts, even in aid of their own valid processes," are limited by the Due Process Clause in their ability to "dismiss an action without affording a party the opportunity for a hearing on the merits of his cause."[95] "[H]aving made access to the courts an entitlement or a necessity, the State may not deprive someone of that access unless the balance of . . . interests favors the government scheme."[96] Moreover, as the Court explicitly held in *M.L.B. v. S.L.J.*, "decrees forever terminating parental rights" fall in the "category of cases in which the State may not bolt the door to equal justice."[97]

¶116 While it is true that Mr. Bolden frames his argument in terms of substantive due process, he has squarely challenged the statute under the Due Process Clause, and this court has said that

---

[93] *Boddie v. Connecticut*, 401 U.S. 371, 376–77 (1971) (holding that it was unconstitutional under the due process clause to deny indigent individuals access to the courts because of their inability to pay a filing fee); *M.L.B. v. S.L.J.*, 519 U.S. 102, 107 (1996) (declaring unconstitutional a state requirement that parents pay a fee for preparation of the trial record in order to appeal a termination of custody); *Logan*, 455 U.S. at 437.

[94] 455 U.S. at 437 (alterations in original) (citations omitted) (internal quotation marks omitted); *see also id.* at 430 n.5; *M.L.B*, 519 U.S. at 120; *Wilson v. Iseminger*, 185 U.S. 55, 62–63 (1902) ("In all such cases the question is one of reasonableness, and we have, therefore, only to consider whether the time allowed in this statute is, under all the circumstances, reasonable."); *Burford v. Tennessee*, 845 S.W.2d 204, 208 (Tenn. 1992).

[95] *Logan*, 425 U.S. at 429.

[96] *Id.* at 430 n.5.

[97] 519 U.S. at 124 (internal quotation marks omitted).

it will be "unwilling to disregard controlling authority that bears upon the ultimate resolution of a case solely because the parties did not raise it below."[98]  The majority claims that no authority exists that "yields a judicial prerogative to second-guess the wisdom of state law standards . . . under the guise of procedural due process."[99]  But on the contrary, if the legislature has violated the constitution, such "second-guessing" is this court's raison d'être. Moreover, evaluating a properly presented constitutional challenge to a given law is in no way an exercise of "free-wheeling authority"[100]—it is a proper exercise of our actual authority.[101]

[98] *Patterson v. Patterson*, 2011 UT 68, ¶ 18, 266 P.3d 828.

[99] *Supra* ¶ 23 n.9.

[100] *Supra* ¶ 23 n.9.

[101] *See*, *e.g.*, *Burford*, 845 S.W.2d at 208 (striking down a statute of limitations as depriving plaintiff of a "reasonable opportunity" to have his claim heard and holding that  "before a state may terminate a claim for failure to comply with procedural requirements . . . due process requires that potential litigants be provided an opportunity for the presentation of claims at a meaningful time and in a meaningful manner"); *see also Logan*, 455 U.S. at 426, 428; *Ky. Union Co. v. Kentucky*, 219 U.S. 140, 156–57 (1911) ("A time *not unreasonably short* for the beginning of actions may be fixed by the legislature, having in view particular conditions without violating the due process clause."(emphasis added)); *Wilson*, 185 U.S. at 62 ("[A]ll statutes of limitation must proceed on the idea that the party has full opportunity afforded him to try his right in the courts. A statute could not bar the existing rights of claimants without affording this opportunity; if it should attempt to do so, it would not be a statute of limitations, but an unlawful attempt to extinguish rights arbitrarily, whatever might be the purport of its provisions."); *Terry v. Anderson*, 95 U.S. 628, 632–33 (1877) ("[S]tatutes of limitation affecting existing rights are not unconstitutional, if a reasonable time is given for the commencement of an action before the bar takes effect."); *Fields v. Legacy Health Sys.*, 413 F.3d 943, 956–57 (9th Cir. 2005) (analyzing a procedural due process challenge to a statute of limitations and rejecting it because the statute was not "arbitrary [or] irrational" and noting that "[c]ourts will *generally* uphold a statute of limitations against a due process challenge as long as the plaintiff is accorded a reasonable time,

When presented with a constitutional challenge, it is our job to evaluate whether the legislature has overstepped its constitutional bounds.[102]  That is what Mr. Bolden has asked us to do here, and the majority abrogates its judicial duty by refusing to fully address his constitutional claim.

¶117 Procedural due process issues arise when an individual is "claiming a right to a fair *process* in connection with [his] suffering a deprivation of life, liberty, or property."[103]   The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner."[104]  It is well established that there is a "requirement of fair procedure before men are denied or deprived of rights."[105]  As Justice Frankfurter elo-

---

under all the circumstances, to bring suit before the bar takes effect" (emphasis added)); *People v. Germany*, 674 P.2d 345, 350, 353 (Colo. 1983) (holding that statute creating an absolute time bar to collateral attacks by defendants on criminal convictions violated due process of law under the United States and Colorado Constitutions because it was not reasonable and did not provide a "meaningful opportunity" for the litigant to be heard).

[102] *Marbury v. Madison*, 5 U.S. 137, 177 (1803) ("It is emphatically the province and duty of the judicial department to say what the law is.").

[103] Erwin Chemerinsky, Constitutional Law: Principles and Policies 579 (3d ed. 2006); *see also Mathews v. Eldridge*, 424 U.S. 319, 332 (1976) ("Procedural due process imposes constraints on governmental decisions which deprive individuals of 'liberty' or 'property' interests . . . ."); *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950) ("Many controversies have raged about the cryptic and abstract words of the Due Process Clause but there can be no doubt that at a minimum they require that deprivation of life, liberty, or property by adjudication be proceeded by notice and opportunity for hearing appropriate to the nature of the case.").

[104] *Mathews*, 424 U.S. at 333 (internal quotation marks omitted).

[105] *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 165 (1951) (Frankfurter, J., concurring); *see also Lassiter v. Dep't of Soc. Servs.*, 452 U.S. 18, 33 (1981) ("In its Fourteenth Amendment, our Constitution imposes on the States the standards necessary to en-

quently stated in 1951, "[t]he heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness."[106]

¶118 Utah has recognized the importance of due process since its founding.[107] Utah's Due Process Clause provides a guarantee "that a party shall have his day in court."[108] Due process of law "hears before it condemns, proceeds upon inquiry, and renders judgment only after trial."[109]

¶119 Due process is "flexible," and requires analysis of the "given situation" in order to ensure that individuals facing deprivation are afforded procedures that comport with fundamental fairness.[110] "Applying the Due Process Clause is therefore an un-

---

sure that judicial proceedings are fundamentally fair."); *Nelson v. City of Orem*, 2013 UT 53, ¶ 28, 309 P.3d 237; *In re Worthen*, 926 P.2d 853, 877 (Utah 1996) ("[T]he demands of due process rest on the concept of basic fairness of procedure and demand a procedure appropriate to the case and just to the parties involved." (internal quotation marks omitted)).

[106] *McGrath*, 341 U.S. at 170–71 (Frankfurter, J., concurring) ("The validity and moral authority of a conclusion largely depend on the mode by which it was reached.").

[107] *See* UTAH CONST. art. I, § 7 ("No person shall be deprived of life, liberty or property, without due process of law."); *see also* PROCEEDINGS & DEBATES OF THE CONVENTION ASSEMBLED TO ADOPT A CONSTITUTION FOR THE STATE OF UTAH (1895), http://le.utah.gov/documents/conconv/utconstconv.htm.

[108] *Christiansen v. Harris*, 163 P.2d 314, 316 (Utah 1945).

[109] *Id*. at 316–317 (internal quotation marks omitted) (explaining that due process requires certain "steps essential" before the state may "deprive a person of life, or liberty").

[110] *Labrum v. Utah State Bd. of Pardons*, 870 P.2d 902, 909, 911 (Utah 1993); *Worthen*, 926 P.2d at 876; *accord Mathews*, 424 U.S. at 334; *see also Thurnwald v. A.E.*, 2007 UT 38, ¶ 38, 163 P.3d 623 (noting that to deprive an unwed father and his child of the possible benefits of their relationship simply because the unwed father

certain enterprise" in which the court "must discover what 'fundamental fairness' consists of in a particular situation."[111]  But the overarching principle is that due process "expresses the requirement of fundamental fairness."[112]

¶120 When deciding whether a certain procedure has been fundamentally fair in accordance with the constitutional guarantee of due process, we begin by determining what private interest has been "affected by governmental action."[113]  This is because "[t]he extent to which procedural due process must be afforded the recipient is influenced by the extent to which he may be 'condemned to suffer grievous loss.'"[114]  Indeed, the Supreme Court has long held that "the degree of potential deprivation that may be created by a particular decision is a factor to be considered in assessing the validity of any . . . decisionmaking process."[115]

¶121   According to the majority, Mr. Bolden could not raise a procedural due process claim where he failed to file the affidavit as a "result of his own procedural misstep."[116]  But Mr. Bolden challenges the constitutionality of that very procedure.  To dismiss Mr. Bolden's constitutional challenge to section 78B-6-121(3)(b) by reasoning that Mr. Bolden should have complied with the statute he challenges is an excellent example of circular reasoning.[117]  I agree with the majority that the State "accords *due* process when it terminates a claim for failure to comply with a

---

failed to file a notice on time "[*flies*] *in the face of fundamental fairness* and due process"(alteration in original) (emphasis added)).

[111] *Lassiter*, 452 U.S. at 24–25.

[112] *Id*. at 24 (internal quotation marks omitted).

[113] *Goldberg v. Kelly*, 397 U.S. 254, 263 (1970) (internal quotation marks omitted).

[114] *Id.* at 262–63 (citation omitted).

[115] *Mathews*, 424 U.S. at 341.

[116] *Supra* ¶¶ 6, 28 n.12 (claiming that Mr. Bolden is "in . . . no position to complain that his own failure amounted to a violation of procedural due process").

[117] *Supra* ¶¶ 6, 28 n.12.

reasonable procedural or evidentiary rule."[118]   But the majority fails to recognize that the given procedural requirement must be *reasonable*, and the affidavit requirement is not.  Due process is not necessarily satisfied because a person receives some variety of notice and some opportunity, however minimal, and however arbitrary, for a hearing.  Instead, due process "calls for such procedural protections as the particular situation demands."[119]   This court has held that the essential requirements of due process include "an inquiry into the merits of the question" and a "fair opportunity to submit evidence" at one's hearing.[120]  Mr. Bolden received neither.

¶122  The loss of one's children is rightly viewed as one of the most "grievous"[121] losses a person can suffer.  It is "plain beyond the need for multiple citation that a natural parent's desire for and right to the companionship, care, custody, and management of his or her children is an interest far more precious than any property right."[122]   Despite the majority's dismissive stance toward the right of an unmarried biological father to raise his child,[123] a desire to parent and a fundamental interest in parenting one's child does not turn on whether a person is male or female, unmarried or wed.

¶123  The United States Supreme Court held in *Lehr v. Robertson* that an unwed father who "demonstrates a full commitment to the responsibilities of parenthood by 'com[ing] forward to participate in the rearing of his child'" acquires "substantial protection

---

[118] *Supra* ¶ 28 n.12 (citing *Logan*, 455 U.S. at 437).

[119] *Mathews*, 424 U.S. at 334 (internal quotation marks omitted).

[120] *Christiansen*, 163 P.2d at 317.

[121] *Santosky v. Kramer*, 455 U.S. 745, 758 (1982).

[122] *Id*. at 758–59 (internal quotation marks omitted).

[123] *See supra* ¶ 55 n.20 ("A general tradition of respect for parental rights comes nowhere close to establishing a fundamental right for unwed fathers to unfettered control of their offspring."); ¶ 60 (dismissing Mr. Bolden's "insist[ence]" that his interest is "more than a mere biological connection" as having "no principled basis").

under the due process clause."[124] Because unwed fathers are "not automatically identified by virtue of their role in the process of birth,"[125] it is true that "the mere existence of a biological link" alone does not merit full constitutional protection.[126] Yet, an unwed father who has "merely" a biological link to a given infant still benefits from constitutional protection. Even if a father has failed to or has not yet demonstrated a "full commitment to the responsibilities of parenthood," under the Due Process Clause, a state must still adequately protect an unwed father's *opportunity* to form a parental relationship.[127] Of course, in *Lehr*, the child in question was over two years old and the father had done nothing to develop a relationship with her.[128] Thus, the question of whether the father had made a commitment to parent her was much easier to answer in the negative. The situation is quite different where a days-old infant is concerned, as in this case. When a child has just been born, no one has a substantial "relationship" with that child yet. Here, Mr. Bolden tried to ensure he would have a relationship with his infant daughter both before she was born and in the days immediately after her birth. Unlike in *Lehr* and *Quilloin v. Walcott*, this is a case in which the unwed father has at all times sought custody of his child.[129] Accordingly, our

---

[124] 463 U.S. 248, 261 (1983) (alteration in original) (citation omitted). I would hold that Mr. Bolden demonstrated a full commitment to his parental responsibilities and was thus entitled to substantive due process protection, *see infra* Part II.B, but even if he did not, Mr. Bolden's procedural due process rights as an unwed father were also violated.

[125] *Wells v. Children's Aid Soc'y of Utah*, 681 P.2d 199, 203 (Utah 1984).

[126] *Lehr*, 463 U.S. at 261. This court has characterized the unwed father's right to parent his child as "provisional." *R.C.S. v. A.O.L. (In re Baby Girl T.)*, 2012 UT 78, ¶ 11, 298 P.3d 1251.

[127] *Lehr*, 463 U.S. at 261–63.

[128] *Id.* at 249–50.

[129] 434 U.S. 246, 255 (1978) (holding that natural father's rights under the Due Process Clause were not violated by application of the "best interests of the child" standard where natural father had

analysis of the fundamental fairness of the procedures afforded Mr. Bolden should be different.

¶124 The procedures in place in Utah Code section 78B-6-121(3) determine whether an unwed father has successfully asserted his "inchoate" parental right.[130] Utah Code section 78B-6-121(3) thus critically affects that father's "protected liberty interest in the opportunity to preserve a relationship with his child."[131] Under our caselaw, while unwed fathers may not have a "full-blown" parental interest in their newborn children, they nevertheless have a fundamental interest in their ability and opportunity to assert full parental status.[132]

¶125 In this case, Mr. Bolden sought to assert his opportunity interest in raising his biological child. This right is a remarkably important one, and is inextricably tied with the fundamental right to rear one's own children. The right to a relationship with one's children is one of the most precious rights known to humankind and thus individuals facing the loss of this right deserve ample, vigorous procedural protection,[133] not a statutory labyrinth. Mr. Bolden was deprived of a relationship with his biological child based on a technicality—he received bad advice from his

---

not petitioned for "legitimation" at any time in an 11-year period between the child's birth and the filing of an adoption petition).

[130] *In re Baby Girl T.*, 2012 UT 78, ¶ 18.

[131] *Id.* ¶ 19 n.6; *accord Thurnwald*, 2007 UT 38, ¶ 28.

[132] *In re Baby Girl T.*, 2012 UT 78, ¶ 18; *Thurnwald*, 2007 UT 38, ¶ 28 ("[A]n unwed father's opportunity interest in developing a relationship with his newborn [is] a 'provisional right' that is itself protected by the due process clause of the Utah Constitution."); *see also Lehr*, 463 U.S. at 262; *Santosky*, 455 U.S. at 759 ("A parent's interest in the accuracy and justice of the decision to terminate his or her parental status" is a "commanding one.").

[133] *See Stanley v. Illinois*, 405 U.S. 645, 651 (1972) ("It is plain that the interest of a parent in the companionship, care, custody, and management of his or her children 'come(s) to this court with a momentum for respect lacking when appeal is made to liberties which derive merely from shifting economic arrangements." (alteration in original) (citation omitted)).

lawyer and failed to submit an affidavit, though he had already submitted numerous other documents and complied with our uniquely complex adoption statute in every other way.

¶126 The majority dismisses Mr. Bolden's due process concerns as posing the risk of leading this court to "a series of line-drawing problems."[134]  Even if this were true, such a rationale cannot justify perpetuating a statute that is fundamentally unfair as applied to Mr. Bolden.[135]  By refusing to robustly address Mr. Bolden's constitutional challenge, the majority upholds a statutory regime that was created to reduce unmarried biological fathers' rights to the barest minimums.[136]  The majority simply dismisses Mr. Bolden's procedural due process claim.  It is not clear at what point, if any, the majority would agree that a statute's strict requirements become so onerous and arbitrary—so fundamentally unfair—that they violate procedural due process.  I believe that the affidavit requirement, as applied to Mr. Bolden, is over the line and deprived him of fair process.

¶127 Because an unmarried father's liberty interest in asserting his parental status is so strong, I would hold that, as applied to Mr. Bolden, the affidavit requirement was fundamentally unfair.[137]  The application of the affidavit requirement here deprived

---

[134] *Supra* ¶ 60.

[135] *See Stanley*, 405 U.S. at 656–57 ("Procedure by presumption is always cheaper and easier than individualized determination.  But when, as here, the procedure forecloses the determinative issues[,] . . . when it explicitly disdains present realities in deference to past formalities, it needlessly risks running roughshod over the important interests of both parent and child.").

[136] A statutory regime, indeed, that gleefully set out to "test the bounds of Constitutional protection for . . . biological fathers."  Brent J. Clayton, Note, *A Day Late & A Dollar Short: Should Utah's Unmarried Dads Get One More Chance to Claim Their Newborns?*, 10 J.L. & FAM. STUD. 249, 260 (2007) (quoting sponsoring Senator Charles H. Stewart's 1994 drafting instructions for the Utah Adoption Act).  It has certainly succeeded on that account.

[137] *Lassiter*, 452 U.S. at 24–25 ("[T]he phrase [due process] expresses the requirement of 'fundamental fairness,' a requirement whose meaning can be as opaque as its importance is lofty.  Ap-

Mr. Bolden, who complied with section 78B-6-121(3) in every other way, of his right to a meaningful hearing[138] before he lost the opportunity to be a father to his son. It was thus fundamentally unfair, and under these circumstances I cannot agree that Mr. Bolden received the protection of the United States and Utah Constitutions' guarantee of due process of the law.

¶128 Accordingly, I would hold that Mr. Bolden was denied adequate procedural due process and that his consent to the adoption was required.

### B.  Substantive Due Process

¶129 Mr. Bolden claims that his interest in parenting his biological child is a fundamental right and as such deserves protection under the Due Process Clause. The majority mischaracterizes Mr. Bolden's claim, stating that he has asserted the "right to perfect his parental rights on something less than the grounds prescribed by the legislature" and "a perfected right in unmarried biological fathers arising upon their mere filing of a paternity suit."[139] This is not the right that Mr. Bolden has asserted. This misstatement cannot be traced to anything contained in Mr. Bolden's briefs or oral argument. Instead, Mr. Bolden explicitly stated that the right he is asserting for protection under the Due Process Clause is "an unwed father's provisional right to raise his newborn." And we have clearly announced the proper framework for such a challenge: "the proponent of legislation infringing parental rights must show (1) a compelling state interest

---

plying the Due Process Clause is therefore an uncertain enterprise which must discover what 'fundamental fairness' consists of in a particular situation by first considering any relevant precedents and then by assessing the several interests that are at stake.").

[138] *Worthen*, 926 P.2d at 876 ("[A]n opportunity to be heard in a meaningful way [is] at the very heart of procedural fairness." (internal quotation marks omitted)); *see also id.* at 876 & n.14 ("emphasiz[ing]" that the opportunity to be heard in a meaningful way is a "minimum requirement[]" and noting that due process "calls for the procedural protections that the given situation demands" (internal quotation marks omitted)).

[139] *Supra* ¶¶ 59, 61.

in the result to be achieved and (2) that the means adopted are narrowly tailored to achieve the basic statutory purpose."[140]

¶130 The majority dismisses Mr. Bolden's clear invocation of his parental right as "fram[ed] at too-high a level of generality" and, even more strangely, claims that his assertion of a so-called "generic interest in parenthood" is not "precise" enough.[141] This position cannot be squared with Supreme Court precedent, which has long recognized that the private interest of a father in the custody of his children is both "cognizable and substantial."[142] Mr. Bolden is not required to claim any more precise an interest than the fundamental, if provisional, right to raise his child, and the majority's requirement that he provide something more appears to avoid the issue. First, the court claims that Mr. Bolden did not and cannot raise a procedural due process challenge, but then it refuses to acknowledge that he has a protected substantive due process right. This rhetorical ploy gives the impression that the court is unmotivated to engage in a robust treatment of the issues.

¶131 Contrary to the plurality's[143] assertion that Mr. Bolden's substantive due process claim rests on an "innovation[] undisciplined by any but abstract formula[],"[144] Mr. Bolden's claim rests upon "perhaps the oldest of the fundamental liberty interests" recognized by the Supreme Court[145] and a right that has been rec-

---

[140] *Wells*, 681 P.2d at 206 (internal quotation marks omitted); *see also Thurnwald*, 2007 UT 38, ¶¶ 28–35.

[141] *Supra* ¶ 59 n.22.

[142] *Stanley*, 405 U.S. at 652; *Lehr*, 463 U.S. at 262–63 (discussing an unwed father's due process right, stemming from his inchoate parental right, to the "opportunity to form" a full parental relationship with his child).

[143] Because Judge Orme concurred in the judgment and did not join Part II.A.2.c or Part II.A.3 of Justice Lee's opinion, throughout this section I will refer alternatively to either the "plurality" or the "majority" opinion, depending on whether the section was or was not joined by Judge Orme.

[144] *Supra* ¶ 59.

[145] *Troxel v. Granville*, 530 U.S. 57, 65 (2000).

ognized by this court.[146]  The plurality fails to appreciate that our 1982 case *Wells v. Children's Aid Society* explicitly recognized an unwed father's fundamental, "provisional right" to raise his children and held that a statute that interferes with such a right is subject to strict scrutiny.[147]  There, we stated very clearly that *under the Utah Constitution*, "an unwed father's right to his relationship with his newborn is a provisional right . . . . [and] [w]e measure the statutory specifications for the termination of that provisional right against the tests of compelling state interest and narrowly tailored means."[148]  The plurality goes to great lengths in its attempt explain *Wells* away, but it ultimately fails to convincingly to do so.  Instead of following *Wells* as precedent under the principle of stare decisis, the plurality instead (1) spuriously labels it "dicta," (2) claims that it has been effectively overruled by later cases, and finally (3) simply asserts that the court today would have decided the case differently — maligning the decision as having "shaky" support and a "bit too facile" conclusion.[149]  The plurality asserts that the *Wells* court relied on an "abstract formula" when it deemed an unwed father's parental interest fundamental.[150]  But one does not need to rely on any formula to conclude that a father has a deep, personal interest in his child, and if he steps forward at the child's birth, that right should not be taken away by the government absent a compelling reason.[151]

---

[146] *See, e.g.*, *Thurnwald*, 2007 UT 38, ¶ 33; *Wells*, 681 P.2d at 206–07; *In re J.P.*, 648 P.2d 1364, 1373–74 (Utah 1982).

[147] 681 P.2d at 206–07.

[148] *Id.* at 206.

[149] *Supra* ¶¶ 50, 51.

[150] *Supra* ¶ 52.

[151] *Cf. Lehr*, 463 U.S. at 256 ("The intangible fibers that connect parent and child have infinite variety. They are woven throughout the fabric of our society, providing it with strength, beauty, and flexibility."); *id.* at 261 ("When an unwed father demonstrates a full commitment to the responsibilities of parenthood by com[ing] forward . . . his interest in personal contact with his child acquires substantial protection under the due process clause."(first alteration in original) (internal quotation marks omitted)).

NEHRING, A.C.J., dissenting

¶132 Despite this court's decisions in *Wells*, *Thurnwald*, and the bulk of United States Supreme Court authority to the contrary,[152] the plurality proceeds as though unmarried biological fathers have no substantive due process rights, provisional or otherwise.[153] Without justification, the majority describes Mr. Bolden's asserted right to the custody of his biological child as a request that this court recognize a "new" right of substantive due process.[154] The right of an unwed father to assert his parental status is not new, and the majority's approach constitutes a dramatic departure from our jurisprudence.

¶133 The majority begins its discussion with a lengthy exposition of the United States Supreme Court's *Lochner* era.[155] This

---

[152] *Michael H. v. Gerald D.*, 491 U.S. 110, 128–29 (1989) (Scalia, J., plurality opinion); *Lehr*, 463 U.S. at 261; *Santosky*, 455 U.S. at 746; *Stanley*, 405 U.S. 645 at 657–58.

[153] *Supra* ¶¶ 38–39, 51–53, 57. The plurality asserts that the Supreme Court's longstanding exaltation of the fundamental interest of parents in the care, custody, and control of their children, *see, e.g.*, *Troxel*, 530 U.S. at 65, "comes nowhere *close* to establishing a . . . fundamental right of an unwed father." *Supra* ¶57 n.21 (emphasis added). Instead, the plurality goes on, unwed fathers have only a "provisional right, subject to reasonable regulation." *Id.* Thus, the plurality envisions an unwed father's interest in his child as utterly separate and distinct from any historical right of parents to care for their children, and instead classifies the parental right of unwed fathers as subject to the lowest level of constitutional protection.

[154] *Supra* ¶ 34 n.14 (explaining the court's view that the *Lochner* era cases provide a "cautionary reminder of the perils of over-exuberant invocations of the judicial power to recognize *new* fundamental rights" (emphasis added)); ¶ 6 (Mr. Bolden "fails to present evidence that the right he asserts (to preserve his rights as an unwed father without filing an affidavit) is a matter deeply rooted in established history and tradition").

[155] A majority of this court has disapproved of opinions that contain "length[y]" writing on topics that do "not affect the resolution" of the case. *State v. Walker*, 2011 UT 53, ¶ 21, 267 P.3d 210; *see also Utah Safe to Learn-Safe to Worship Coal., Inc. v. State*, 2004 UT

discussion has no place in the analysis. Even post-*Lochner*, the United States Supreme Court and this court have consistently upheld substantive due process concerning certain non-economic rights, including "parents' inherent right and authority to rear their own children."[156] While placing the law in "historical context" may be a proper academic pursuit, I believe such verbosity is best curtailed, particularly in what is already a lengthy opinion. While extended historical analysis may occasionally be called for, it should be used sparingly and with restraint. In my view, the court should be reluctant to include dicta indicating its opinions about the history of the law.[157] The truth is, it is well established under the law of both the United States and Utah that an unwed father's interest in asserting custody of his infant child or retaining custody of his older children is "cognizable and substantial."[158]

¶134 Moreover, though the plurality claims that there is no "historical basis" for a deeply rooted fatherly parental right,[159] in

---

32, ¶ 19, 94 P.3d 217 ("The courts are not a forum for hearing academic contentions . . . .").

[156] *Stanley*, 405 U.S. at 651; *In re J.P.*, 648 P.2d 1365, 1373 (Utah 1982) (recognizing and upholding "parents' inherent right and authority to rear their own children" under a substantive due process analysis).

[157] *Compare supra* ¶ 30 ("the Due Process Clause is not a license for the judicial fabrication of rights that judges might prefer, on reflection, to have been enshrined in the constitution"), *and* ¶¶ 32–37 (explaining the "lesson of *Lochner*"), *with* ¶ 31 ("That said, the principle of substantive due process is ingrained in both federal and state precedent. So although we proceed cautiously in this domain we cannot repudiate the substantive due process inquiry altogether.").

[158] *Stanley*, 405 U.S. at 652; *Wells*, 681 P.2d at 202, 206–07.

[159] *Supra* ¶¶ 59, 54. Indeed, the majority itself unwittingly acknowledges this, stating that "[t]he integrity of the family and the parents' inherent right and authority to rear their own children have been recognized as fundamental axioms of Anglo-American culture, presupposed by all our social, political, and legal institutions." *Supra* ¶ 39.

fact the recognition of the parental rights of fathers has a strong basis in American and English history.  As this court explained in 1982, the "parental right . . . is rooted . . . in nature and human instinct. . . . [T]he parent's right, as well as duty, to care for a child may be termed natural, as well as legal and moral."[160]  The historical importance of fathers is well captured in a Mississippi Supreme Court case from 1900:

> Undoubtedly, the father has primarily, by law as by nature, the right to the custody of his children. . . . Nature and the law ratifying nature assume that the author of their being feels for them a tenderness which will secure their happiness more certainly than any other tie on earth. Because he is the father, the presumption naturally and legally is that he will love them most, and care for them most wisely.[161]

Or, as we stated in *In re J.P.*,

> *Men and women* in most cultures have long viewed their offspring as somehow being an extension of themselves, and as more than mere 'property.' The bearing and raising of children has probably brought people into contact with some sense of the Infinite, the mysteries of the universe, or Nature—however one may express it—more than any other human experience. Thus, it is not surprising that common law judges refer to parental interests as 'sacred,' 'natural,' or 'fundamental' rights, espe-

---

[160] *In re J.P.*, 648 P.2d at 1374–75 (internal quotation marks omitted).

[161] *Hibbette v. Baines*, 29 So. 80, 81 (Miss. 1900).  While it is true that much has changed in our society's view of children and marriage since 1900, the point is that fatherhood has long been exalted and recognized as a right deserving of the utmost protection.  Societal changes since 1900 have erased the stigma of illegitimacy and drastically increased the number of children born outside of wedlock.  Cases like *Hibbette* merely illustrate what should go without saying—that fathers' parental rights have long been considered of fundamental importance.

cially when the constitutional standard for a 'fundamental' right is whatever judges find when they look to the traditions and (collective) conscience of our people to determine whether a principle is so rooted (there) . . . as to be ranked as fundamental. . . .[162]

¶135 It is true that, historically, out-of-wedlock births were relatively rare and socially inappropriate, exposing both father and child to social and legal stigma. In the twenty-first century, however, cultural attitudes toward out-of-wedlock births have shifted. In 2012, over 40 percent of births in the United States were to unmarried women.[163] As we noted in *In re Baby Girl T.*, "policies predicated on the notion that unwed fathers are universally uninterested in their offspring or unwilling to embrace parenthood—even when unwed mothers on occasion are not—are being overtaken by stark . . . changes in public attitudes toward marriage."[164]

¶136 Due to the nature of the birth process, the identity of the father of an unmarried woman's baby is not immediately obvious.[165] While on that basis the United States Supreme Court and this court have held that an unmarried father's parental right is "provisional" or "inchoate"—we have never held that it is no

---

[162] 648 P.2d at 1376–77 (alterations in original) (emphasis added) (internal quotation marks omitted).

[163] Joyce A. Martin et. al, *Births: Final Data for 2012*, NATIONAL VITAL STATISTICS SYSTEM, CENTERS FOR DISEASE CONTROL & PREVENTION, 2 (Dec. 30, 2013), http://www.cdc.gov/nchs/data/nvsr/nvsr62/nvsr62_09.pdf.

[164] 2012 UT 78, ¶ 18 n.5; *see also* George A. Akerlof & Janet L. Yellen, *An Analysis of Out-Of-Wedlock Births in the United States*, BROOKINGS INSTITUTE, (Aug. 1996), http://www.brookings.edu/research/papers/1996/08/childrenf amilies-akerlof (stating that "[b]efore 1970, the stigma of unwed motherhood was so great that few women were willing to bear children outside of marriage" but "out-of-wedlock childbearing no longer results in social ostracism").

[165] *Nguyen v. I.N.S.*, 533 U.S. 53, 62 (2001).

right at all.[166] Indeed, this court has said that an unmarried father's opportunity to assert parental rights demands protection from governmental infringement through the use of strict scrutiny.[167] I would recognize the importance of an unwed father's provisional right by applying strict scrutiny to legislation that infringes upon it. The plurality denies that Mr. Bolden has any protected substantive due process interest in his newborn, fails to employ strict scrutiny, and thereby abandons decades of precedent. In short, the court fails to protect the parental rights of unmarried fathers, to say nothing of the children who will grow up without ever knowing them.

¶137 The court acknowledges that our decision in *Wells v. Children's Aid Society* "adopted a different standard [of scrutiny] under the Utah Constitution."[168] The court explains, correctly, that "we concluded in *Wells* that the proponent of legislation infringing parental rights must show (1) a compelling state interest in the result to be achieved and (2) that the means adopted are narrowly tailored."[169] Despite this, the plurality nevertheless disregards *Wells* on the basis that the standard employed there "is in some tension with . . . subsequent cases" and is "in any event . . . dicta."[170] It is neither.

---

[166] *In re Baby Girl T.*, 2012 UT 78, ¶¶ 18–20; *Thurnwald*, 2007 UT 38, ¶ 28; *Wells*, 681 P.2d at 206.

[167] *Wells*, 681 P.2d at 207 ("We measure the statutory specifications for the termination of [an unwed father's] provisional right against the tests of compelling state interest and narrowly tailored means."); *Thurnwald*, 2007 UT 38, ¶ 28.

[168] *Supra* ¶ 42.

[169] *Supra* ¶ 42 (internal quotation marks omitted).

[170] *Supra* ¶¶ 43, 47–48, 50. Additionally, in our 2007 case *Thurnwald v. A.E.*, we cited and employed the *Wells* standard. 2007 UT 38, ¶¶ 32–33. There, we held that a provision of the Adoption Act that cut off unwed fathers' ability to file on holidays and weekends was "*not necessary to achieve the state's compelling interests*" nor was it a "*narrowly tailored means of achieving those interests.*" *Id.* ¶ 35 (emphasis added). Because we recognized that strict scrutiny was the proper standard there, and because the relevant statute would not survive that scrutiny, we engaged in a

¶138 The plurality explains that it would overrule *Wells*[171] in part because it claims that two later cases, *In re Adoption of T.B.* and *In re Baby Girl T.*, control as the "most recent pronouncements" on the issue of the standard of scrutiny.[172] But the plurality fails to note that there is an obvious reason that the *Wells-Thurnwald* line of cases was not used in *In re Adoption of T.B.* and *In re Baby Girl T*—it is because the putative father in those cases *did not bring a claim under the Utah Constitution*.[173] This omission is glaring and deeply undercuts the plurality's justification for proceeding as though *Wells* and *Thurnwald* were overridden.[174] It is true that *In re Baby Girl T,* the court states that "due process re-

---

constitutional avoidance analysis and instead read into the statute a caveat that a father's rights could not be cut off simply because the birth occurred on a weekend. *Thurnwald*, thus, was a case where this court emphasized that the *Wells* standard applied, even if it was ultimately not needed on the basis of constitutional avoidance.

[171] Because Judge Orme has remained silent on these issues and has provided no opinion on the proper standard of scrutiny or the nature of Mr. Bolden's asserted right, the court today issues no holding concerning the level of scrutiny that should be applied to Mr. Bolden's substantive due process claim. A majority of the court believes that the *Wells* standard is "in some tension" with later cases, *supra* ¶ 43, but without a third vote, the court is unable to provide a solution to the asserted conflict. *Supra* ¶¶ 46–57 (Lee, J., plurality opinion). As a result, the status of the law in this area appears to be unsettled.

[172] *Supra* ¶ 49; *R.C.S. v. A.O.L. (In re Baby Girl T.)*, 2012 UT 78, 298 P.3d 1251; *T.M. v. B.B. (In re Adoption of T.B.)*, 2010 UT 42, 232 P.3d 1026. The plurality would also abrogate *Thurnwald*, which approved of and used the *Wells* strict-scrutiny standard as part of a constitutional avoidance analysis. 2007 UT 38, ¶¶ 28, 32–33, 35.

[173] *In re Adoption of T.B.*, 2010 UT 42, ¶¶ 16, 17 (citing *Mathews*, 424 U.S. at 339–50); *see also id.* ¶ 24 ("[T]he putative father asserts that [the adoption code's] application to him is unconstitutional, both under the Due Process and Equal Protection clauses of the United States Constitution.").

[174] *Supra* ¶ 50.

quires only that an unwed father have 'a meaningful chance to preserve his opportunity to develop a relationship with his child,'" but this statement was made in the context of a procedural due process analysis[175]—not a substantive due process analysis as in *Wells* and *Thurnwald*. Moreover, in *Baby Girl T.*, the father never "expressly articulated" his constitutional challenge and failed to even use the words "due process" in bringing his claim[176]—thus, in *Baby Girl T.*, the court was not addressing a claim brought squarely under the Utah Constitution's Due Process Clause. Similarly, *In re Adoption of T.B.* involved a constitutional challenge brought solely under the United States Constitution, not the Utah Constitution.[177]

¶139 The plurality also claims that "in any event, the *Wells* standard of scrutiny was unnecessary to the outcome in that case, and may thus be viewed as over-enthusiastic dicta."[178] I disagree. A court's reasoning is not "dicta" just because the court "could easily have reached the same conclusion" by using a different standard.[179] A court's holding stems from the reasoning it actually used, and such reasoning cannot be dismissed as mere "dicta." The majority's concept of obiter dictum flouts the basic meaning of that term. Obiter dictum is a "judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision."[180] In other words, it is an "'extrajudicial expression[] of legal opinion'" given by way of "'illustration, argument, analogy,

---

[175] *In re Baby Girl T*, 2012 UT 78, ¶¶ 11, 16, 20 ("[Unwed father's] private interest therefore is in the *opportunity* to develop a substantial relationship with [his infant]. The Act must give him a meaningful and adequate procedure to protect this interest.")..

[176] *Id.* ¶¶ 33, 36 (unwed father "repeatedly made due process arguments, although they were not labeled as such").

[177] 2010 UT 42, ¶¶ 16, 24.

[178] *Supra* ¶ 50.

[179] *Supra* ¶ 50.

[180] BLACK'S LAW DICTIONARY 1177 (9th ed. 2007).

or suggestion.'"[181]  The rule of law used by a court as the basis of its legal conclusion is fundamentally and squarely *not* obiter dictum.  That was the role of the strict scrutiny standard in *Wells*.  In *Wells*, the court explicitly measured a statute's infringement of an unwed father's rights against "the tests of compelling state interest and narrowly tailored means," and found that the statute passed strict scrutiny.[182]  Thus, very simply, the court applied strict scrutiny to reach its conclusion, and that application was not "unnecessary to the outcome."[183]  Under the plurality's approach, if a court *could have* reached an outcome in a different way, the court's actual analysis can later be dismissed wholesale as "dicta."[184]

¶140 *Wells* established the standard of scrutiny for a legislative infringement of parental rights—and more specifically, the parental rights of unwed fathers—under the Utah Constitution,[185] and the plurality's reasons for abrogating it fall flat.[186]  I agree that litigants in Utah should be "entitled to rely on our explication of the law as definitive."[187]  But today the court has, at best, cast

---

[181] *Id.* (citing William M. Lile et al., BRIEF MAKING AND THE USE OF LAW BOOKS 304 (3d ed. 1914)).  For an example of this, see the majority's discussion of *Lochner*, *supra* ¶¶ 32–36.

[182] *Wells*, 681 P.2d at 206–07.

[183] *Supra* ¶ 50.

[184] *Supra* ¶ 50.

[185] *Supra* ¶ 42 (acknowledging that "[o]ur *Wells* decision adopted . . . a standard of heightened scrutiny . . . under the Utah Constitution").

[186] *See, e.g., Vorher v. Henriod*, 2013 UT 10, ¶ 13, 297 P.3d 614 ("Under the doctrine of stare decisis, a party asking us to overturn prior precedent has a substantial burden of persuasion. . . . [L]ong standing precedent should not be overruled except for the most compelling reasons." (second alteration in original) (internal quotation marks omitted)).

[187] *Supra* ¶ 49 & n.17.  *Contra supra* ¶¶ 51–52 (asserting that the analysis in *Wells*, 681 P.2d at 206–07, was "shaky" and "should have" been done differently).

doubt upon the precedential value of *Wells*,[188] a case that has been the law in Utah for thirty years.

¶141 In sum, I would evaluate Mr. Bolden's claim using strict scrutiny and would find that section 78B-6-121(3)(b) fails to satisfy that demanding standard because it is not narrowly tailored, nor does it achieve a compelling government interest. The affidavit requirement violates due process because (1) it is fundamentally unfair to irrevocably foreclose an unwed father's parental rights without affording him robust procedural protection; (2) the State does not have a compelling interest in legislating based on gender stereotypes, nor is the statute narrowly tailored to any compelling interest; and (3) other requirements—which Mr. Bolden satis-fied—suffice to ensure that the unwed father has accepted respon-sibility and stepped forward as a parent as required by *Lehr*.[189]

## CONCLUSION

¶142 The court's decision today represents an indefensible departure from this court's and the United States Supreme Court's constitutional jurisprudence. I would first and foremost hold that Utah Code section 78B-6-121(3)(b) is a violation of Equal Protection under both the Utah Constitution and the United States Constitution. In my view, it impermissibly discriminates on the basis of outdated, offensive, and harmful gender stereotypes. Second, by refusing to engage in a procedural due process analy-sis, the majority unfairly sidesteps this important issue without an adequate justification for doing so. Finally, the court distorts and essentially abandons the time-honored constitutional law of subs-tantive due process by holding that an unwed father's right to as-sert himself as the parent of his child is deserving of the lowest level of protection. The Utah and United States Constitutions strictly protect the fundamental right to parent one's own child-ren; a right that is inextricably linked to the unwed father's oppor-tunity to step forward and assume his parental role. I would hold that section 78B-6-121(3)(b) is fundamentally unfair as applied to Mr. Bolden and deprived him of a meaningful chance for a hear-ing before he lost his rights as a father. Alternatively, I would hold that section 78B-6-121(3)(b) violated Mr. Bolden's substantive

---

[188] *Wells*, 681 P.2d 199.

[189] *Lehr*, 463 U.S. at 262.

due process rights because it infringed his opportunity interest in asserting the fundamental right to parent his newborn son and was not narrowly tailored to serve a compelling government interest.

·

––––––––––

JUSTICE PARRISH, dissenting:

¶143  I agree with Justice Nehring that the affidavit requirement of the Utah Adoption Act (the Act), Utah Code section 78B-6-121(3)(b), unconstitutionally discriminates against unwed fathers on the basis of their gender.  But I find the tenor of his dissent regrettable. In my view, the constitutional validity of the affidavit requirement presents a close issue on which reasonable minds can legitimately disagree.  I therefore write separately on the narrow issue of equal protection.  I would strike the affidavit requirement as violative of the Equal Protection Clause of the United States Constitution.  As a result, I would not address Mr. Bolden's claim that the affidavit requirement violates his right to due process or the uniform operation of laws.

¶144  As both the majority opinion and Justice Nehring's dissent explain, the affidavit requirement discriminates on the basis of sex.[1] In order for an unwed father to perfect his parental rights, he must

> file[] with the court . . . a sworn affidavit:
>
>> (i) stating that he is fully able and willing to have full custody of the child;
>>
>> (ii) setting forth his plans for care of the child; and
>>
>> (iii) agreeing to a court order of child support and the payment of expenses incurred in connection with the mother's pregnancy and the child's birth.[2]

An unwed mother is not required to file a similar affidavit; her parental rights are perfected by default.

––––––––––

[1] *See supra* ¶ 72; *infra* ¶ 87.

[2] UTAH CODE § 78B-6-121(3)(b).

JUSTICE PARRISH, dissenting

¶145 This is facially disparate treatment on the basis of sex. Accordingly, to pass muster under the Equal Protection Clause of the United States Constitution,[3] the affidavit requirement must withstand intermediate scrutiny.[4] To satisfy this standard, the proponent of the requirement, in this case the Does, must demonstrate that the disparate treatment of an unwed mother and an unwed father is "substantially related" to achieving an important governmental objective.[5] Phrased another way, "[t]he fit between the means and the important end [must be] 'exceedingly persuasive.'"[6] In my view, the Does have not satisfied their burden.

## I. INTERMEDIATE SCRUTINY

¶146 The majority correctly recognizes that legislative classifications that discriminate on the basis of gender are evaluated under a standard of intermediate scrutiny. In my view, however, the majority unfairly distinguishes controlling precedent from the United States Supreme Court by implying that there are actually two categories of intermediate scrutiny and then evaluating the affidavit requirement under the less stringent standard.

¶147 The majority would apply a higher level of scrutiny to those cases of "'official action that close[] a door or den[y] opportunity to women (or men).'"[7] In cases of this nature, the majority says that the standard is "difficult" to satisfy because it requires "an 'exceedingly persuasive' justification."[8] The majority says the standard is "easier to satisfy" in all other "less imposing" cases of discrimination on the basis of sex.[9] In particular, when "differential treatment of men and women stems initially . . . from a straightforward matter of biology," the majority would require

---

[3] U.S. CONST. amend. XIV, § 1.

[4] *Nguyen v. I.N.S.*, 533 U.S. 53, 60 (2001).

[5] *Id.*

[6] *Id.* at 70.

[7] *Supra* ¶ 70 (quoting *United States v. Virginia*, 518 U.S. 515, 532 (1996)).

[8] *Supra* ¶ 70 (quoting *Virginia*, 518 U.S. at 532).

[9] *Supra* ¶ 70.

only a "substantial fit" between the legislative objective and the discriminatory means at issue.[10]

¶148   But the United States Supreme Court has not recognized the distinction suggested by the majority.  It has articulated only one definition of intermediate scrutiny applicable in sex discrimination cases.  In fact, it has defined an "exceedingly persuasive justification" as one in which the discriminatory scheme is "substantially related" to the ends it seeks to achieve.[11]  I therefore am not persuaded that the United States Supreme Court cases striking sex-based classifications for failure to advance an exceedingly persuasive justification are distinguishable.[12]   And while I acknowledge that the United States Supreme Court's precedent in this area is far from clear, it appears to me that the majority opinion's formulation of the lower level of intermediate scrutiny it applies is, in practice, virtually indistinguishable from the rational basis review applicable in cases that involve no discriminatory classification.

## II.  THE DOES HAVE FAILED TO MEET THEIR BURDEN OF ESTABLISHING AN EXCEEDINGLY PERSUASIVE JUSTIFICATION FOR THE DISCRIMINATORY AFFIDAVIT REQUIREMENT

¶149   In my view, application of the established standard of intermediate scrutiny to the affidavit requirement leads to the conclusion that the Does have failed to meet their burden of establishing that the Act's disparate treatment of unwed fathers and unwed mothers is substantially related to achieving an important

---

[10] *Supra* ¶ 73.

[11] In *Nguyen*, Justice Kennedy, with Justices Rehnquist, Stevens, Scalia, and Thomas joining, recognized a single standard for evaluating claims of sex discrimination under the Equal Protection Clause, "explain[ing] that an 'exceedingly persuasive justification' is established 'by showing at least that the classification serves important governmental objectives and that the discriminatory means employed are substantially related to the achievement of those objectives.'" 533 U.S. at 70 (quoting *Miss. Univ. for Women v. Hogan*, 458 U.S. 718, 724 (1982) (internal quotation marks omitted)).

[12] *See, e.g.*, *Virginia*, 518 U.S. at 523–24; *Hogan*, 458 U.S. at 724.

governmental objective. The starting point of the analysis is to identify the objectives that the Act is intended to promote.

¶150 The Act sets forth a variety of governmental objectives. It declares that "[i]t is the intent and desire of the Legislature that in every adoption the best interest of the child should govern."[13] The Act further declares that "the state has a compelling interest in requiring unmarried biological fathers to demonstrate commitment" to the responsibilities of parenthood.[14] While the Legislature may prefer that we simply accept what is set out in the "Legislative intent and findings" section of the Act,[15] intermediate scrutiny requires a more searching analysis. This is particularly true in cases such as this, where one of the stated legislative objectives is itself discriminatory—that of requiring that only unmarried biological fathers demonstrate commitment to the responsibilities of parenthood. Therefore, while the Legislature has defined the purpose of the Act as requiring only unmarried biological fathers to demonstrate commitment to parenthood, we must ask why it has no similar objective with regard to unmarried biological mothers. And while the Act purports to further the broad objective of advancing the best interest of the child, we must confront why only biological fathers—and not biological mothers—must express a future commitment to accept full custody of their biological child before they may have any say in the child's future.[16]

---

[13] UTAH CODE § 78B-6-102(1).

[14] *Id.* § 78B-6-102(5)(f).

[15] *See id.* § 78B-6-102.

[16] In practice, the Act defines the best interest of the child as a commitment by the biological father to "have full custody," to develop "plans for care," and to "agree[] to a court order of child support and payment of [pregnancy and birth] expenses." *Id.* § 78B-6-121(3)(b). And this forward-looking commitment is required before an unwed father can have any say regarding the future of his child, whether he intends to consent to a proposed adoption, consent to adoption by others of his choosing, place the child with a close family member, or raise the child himself. No such forward-looking commitment is required on the part of an unwed biological mother.

¶151 Because we cannot allow a discriminatory legislative objective to justify a discriminatory legislative requirement, we must conclude that the Act's objective is to secure a forward-looking commitment by a parent to raise a child before allowing that parent to have any say in the child's future. And if that is the objective, we must ask why such a forward-looking commitment is required of only unwed fathers.

¶152 The majority maintains that the Act serves two purposes. First, the majority posits that it provides a mechanism of promptly identifying those who might be designated as parents.[17]  Second, it ensures that such persons will fulfill their parental role.[18]  I acknowledge that biological differences between men and women justify their disparate treatment with respect to the identification of unwed fathers.  But I fail to see how such biological differences justify treating men and women differently when it comes to their forward-looking commitment to fulfill their parental role.  Because the affidavit requirement relates only to this second objective, I conclude that it fails intermediate scrutiny.

¶153 The starting point for analyzing the Act's disparate treatment of men and women is the legitimate difference between a mother's and a father's biology.  A mother's biological relationship with her child is readily apparent; a father's is not.  Because of this biological fact, I believe it is entirely legitimate for the Act to provide a mechanism for prompt and reliable identification of a child's biological father.  The Act accomplishes this by requiring an unwed biological father to "initiate[] proceedings in a district court of Utah to establish paternity" and to "file[] notice of the commencement of paternity proceedings . . . with the state registrar of vital statistics."[19]  And because the biological mother's identity is obvious, while a biological father's is not, the Act's limitation of these requirements to biological fathers has an exceedingly persuasive fit with the statutory objective of parental identification.

¶154 Similarly, a mother's biology requires her to shoulder responsibility for the expenses of pregnancy and child birth; a fa-

---

[17] *Supra* ¶ 75.

[18] *Supra* ¶ 75.

[19] UTAH CODE § 78B-6-121(3)(a), (c).

ther's biology does not. Based on this legitimate biological difference, the Act provides a mechanism that is substantially related to achieving the important governmental objective of requiring each parent to pay "a fair and reasonable amount of expenses . . . in accordance with his [or her] financial ability."[20] The Act accomplishes this by requiring unwed biological fathers to pay a fair share of such expenses. Again, I find that this requirement is justified by legitimate biological differences and is substantially related to the legislative objective that parents share the financial burden of bringing a child into the world.[21]

¶155 But once a child is born and his or her parents are identified, I do not believe that biological differences between men and women justify disparate treatment of unwed mothers and unwed fathers. The majority posits that a mother's biology allows her to show a commitment to a child by carrying the child to term.[22] And because a father's biology allows no similar biological manifestation of commitment, the majority accepts the affidavit requirement as a "defensible . . . attempt to put unwed parents on equal footing."[23] Assuming that the legislative objective is to put unwed parents on equal footing, I do not believe that the affidavit requirement substantially advances that objective. Indeed, the affidavit requirement demands a commitment from unwed fathers that goes far beyond what a mother's biology necessarily implies about her forward-looking commitment to raise her child.[24] While

---

[20] *Id.* § 78B-6-121(3)(d).

[21] There may be some concern that an unwed mother will, as a result of her biological position as a mother, be forced to raise an unwanted child and be burdened with postbirth expenses if the biological father is allowed to refuse consent to adoption but nevertheless does not take custody of the child or fulfill his financial responsibility. But Utah law provides a mechanism pursuant to which a biological mother can safely relinquish her parental rights and responsibilities apart from adoption. UTAH CODE §§ 62A-4a-802, 78A-6-504, -514.

[22] *Supra* ¶ 78.

[23] *Supra* ¶¶ 79–80.

[24] The plain language of the Act supports this conclusion. Indeed, in the same section of the Act that asserts the State's com-

a father is required to swear "that he is fully able and willing to have full custody of the child," to "set[] forth his plans for care of the child," and to "agree[] to a court order of child support and the payment of [pregnancy and child birth] expenses," no such commitment is required of unwed mothers.[25] In my view, the affidavit requirement provides something less than an exceedingly persuasive fit with the biological differences of commitment expressed through the gestation and birthing process.

¶156 By carrying her child to term, an unwed mother demonstrates some level of commitment. But that commitment cannot necessarily be interpreted as a forward-looking commitment to raise her child. Indeed, because the affidavit requirement is found in the Utah *Adoption* Act, it will only be implicated when a biological mother has no commitment to "have full custody of the child," to develop "plans for care of the child," or to "agree[] to a court order of child support and payment of [pregnancy and birth] expenses."[26] So while a mother without any forward-

---

pelling interest in requiring unwed fathers to demonstrate their commitment to the responsibilities of parenthood, the Act explains that an unwed father "demonstrate[s] [his] commitment by providing appropriate medical care and financial support and by establishing legal paternity." UTAH CODE § 78B-6-102(5)(f). By fulfilling subsections (3)(a) and (3)(c) (the paternity requirements) and (3)(d) (the payment-of-pregnancy-expenses requirement) of section 78B-6-121, an unwed father has satisfied the State's mandate that he demonstrate his commitment to the responsibilities of parenthood. The affidavit requirement is therefore beyond what the Legislature itself has stated is necessary for an unwed father to demonstrate his commitment.

[25] *Id.* § 78B-6-121(3)(b).

[26] *Id.* Further, the Legislature has recognized that some mothers have no commitment to raise a child and has, therefore, provided two mechanisms whereby a mother may relinquish her parental rights and responsibilities. A mother "may safely relinquish a newborn child at a hospital . . . and retain complete anonymity" without fear of investigation or prosecution. *Id.* § 62A-4a-802. Alternatively, she may voluntarily relinquish or consent to termination of her parental rights so long as a court finds that it is in the "child's best interest." *Id.* §§ 78A-6-504, -514.

looking commitment to her child has standing, a father with an identical level of commitment does not.

¶157 In my view, the fit between the Act's objective of securing a specific, forward-looking commitment to raise a child and the affidavit requirement is simply too imprecise to justify the disparate treatment of unmarried biological mothers and unmarried biological fathers. While biology may demonstrate a biological mother's commitment to bring a child into the world, it does not necessarily demonstrate a commitment to raise her child. But the Act requires that an unwed biological father unequivocally express his forward-looking commitment to raise his child. In my view, such a disparate advancement of the State's stated objective in securing parental commitment is not a close enough fit to withstand intermediate scrutiny.

## CONCLUSION

¶158 Because the affidavit requirement of the Utah Adoption Act results in the disparate treatment of unwed fathers and unwed mothers, the Does have the burden of showing that the requirement satisfies intermediate scrutiny. In other words, they must establish that the affidavit requirement is substantially related to achieving an important governmental objective.[28] I do not believe that they have satisfied their burden. The affidavit requirement goes one step too far by requiring unwed fathers, but not unwed mothers, to make forward-looking commitments to child rearing. In so doing, the affidavit requirement tips the balance against the unwed father by requiring him to demonstrate more than the unwed mother demonstrates by the sheer fact of her biology. I would therefore hold that the affidavit requirement of the Utah Adoption Act, Utah Code section 78B-6-121(3)(b), violates the Equal Protection Clause of the United States Constitution.

--------

[28] *Nguyen v. I.N.S.*, 533 U.S. 53, 60 (2001).